**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*One Pierrepont Plaza*
*Brooklyn, New York 11201*

*Mailing Address:* *147 Pierrepont Street*
*Brooklyn, New York 11201*

May 4, 2006

**ELECTRONICALLY FILED**
**COURTESY COPY BY INTEROFFICE MAIL**
The Honorable John Gleeson
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Surgent
Criminal Docket No. 04-364 (S-1)(JG)

Dear Judge Gleeson:

The above-referenced defendant is scheduled to be sentenced before Your Honor on May 12, 2006, at 2:00 p.m. This letter is respectfully submitted in response to the defendant's sentencing motion dated April 26, 2006.

**BACKGROUND**

On July 25, 2006, after a one-week trial, John Surgent was convicted of: (1) conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 and 15 U.S.C. §§ 78j(b) and 78ff; (2) securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff; and (3) conspiracy to commit money laundering, in violation of 18 U.S.C. §1956(8).

The Probation Department prepared a Presentence Report ("PSR"), which concluded that, under the advisory Guidelines, the total offense level in this case is 39, the criminal history category is II, and the imprisonment range is 292-365.

In sum, the defendant argues that the Probation Department incorrectly attributed to him the following: (1) Obstruction of Justice enhancement; (2) three subsections of the Fraud Specific Offense Characteristics; (3) three subsections of the Money Laundering Offense Characteristics; (4) use of a special skill; and (5) multiple count adjustment and combined offense level. (Defense Memorandum ("Def. Memo") at 1-5.) In addition, the defendant raises several non-guideline specific issues in his motion, including a request for a sentence below the

advisory Guideline range either pursuant to a downward departure or a non-Guideline sentence. See United States v. Crosby, 397 F.3 103, 113 (2d Cir. 2005).

With the exception of the defendant's objection regarding the inclusion of a special skill enhancement, the government agrees with the Probation Department and opposes the defendant's motion. Accordingly, our view of the advisory Guidelines includes a total offense level of 37, which carries a 235-293 month range of imprisonment.

## ARGUMENT

### A. Obstruction of Justice

The defense objects to the Probation Department's inclusion of two levels under Guideline 3C1.1 for Obstruction of Justice. (Def. Memo at 1-2.) The obstruction relates to the defendant's testimony at a pretrial hearing held to determine if the protections contained in government proffer agreements were waived knowingly and voluntarily. (PSR at 10, ¶ 26.) Surgent argues, despite Your Honor's rejection of this position during the hearing, that the waivers were not enforceable because of his stated belief that the government had agreed not prosecute him. (Def. Memo at 2.) The only support he offers for the persistence of this position is the continuation of his campaign to place blame on his then attorney, and brother, Jay Surgent. (See Def. Memo at 2.)

Section 3C1.1 provides for a two-level increase in the offense level where the defendant willfully obstructs justice during the course of the investigation, prosecution or sentencing of the offense of conviction or attempts to do so, and the obstructive conduct relates to the offense of conviction, any relevant conduct, or a closely related offense.[1] False statements to law enforcement officers or perjurious testimony by the defendant at any point in the proceedings triggers this adjustment. The enhancement applies when a defendant has falsely testified on a material issue at a suppression hearing, see United States v. Giraldo, 80 F.3d 667, 680 (2d Cir. 1996), or submitted a materially false affidavit in support of a motion to suppress, see United States v. Ahmad, 202 F.3d 588, 593 (2dCir 2000).

The defendant has made exhaustive attempts to portray Jay Surgent as a liar whose alleged corrupt representation was to blame for his predicament,[2] but the evidence in the record instead supports a finding of obstruction by the defendant. Jay Surgent testified during the first day of the hearing that, prior to the first proffer, the government informed him that immunity from prosecution was not a possibility, a fact which he immediately communicated to

---

[1] The 1998 Guideline Manual is applicable in this case.

[2] Your Honor found the attack on Jay Surgent to be "utterly frivolous" and rejected it factually. (June 24, 2005 Transcript at 88.) The Court further found that it was "virtually impossible to question the effectiveness of the counsel rendered by Jay Surgent." (Id. at 85.)

the defendant. (June 24, 2005 Transcript at 14, 15, 22, 23, 44, 50.) He also said that it is his normal practice to review a proffer agreement with his clients. Additionally, the defendant executed the proffer agreement beneath the paragraph that states that attorney and client had reviewed and discussed the agreement's contents and the defendant understood all of its terms. (See id. at 20-21.)

Former Assistant U.S. Attorney Paul Shoeman, who was present in the role of prosecutor during the first proffer, also testified at the hearing that the government never offered immunity to the defendant. (Id. at 62.) During his years as a prosecutor, he never failed to allow defense counsel an opportunity to review a proffer agreement with a witness/defendant prior to an interview. (Id. at 64.) Finally, Mr. Schoman confirmed that he reviewed the proffer agreement with Surgent prior to the first proffer and had used an analogy involving a library book to further explain each paragraph of the agreement. (Id. at 67-70, 75-76.)

The defendant testified that Jay Surgent had a meeting with an Assistant U.S. Attorney who was then handling the investigation, after which Jay Surgent told him he had "worked it out with the government" and he would not be prosecuted. (June 30, 2005 transcript at 17, 18, 20. 21, 25, 26, 28, 29, 33, 50, 57.) Surgent also claimed that he executed the first of several proffer agreements because Jay Surgent told him that these documents were simply "protocol," and part of the immunity agreement. (Id. at 18, 44, 58.) Additionally, the defendant testified that Mr. Schoeman had never reviewed the proffer agreement with him, nor did he mention a library book. (Id. at 48, 60.) Finally, in connection with the hearing, the defendant submitted an affidavit (Exhibit ("Ex.") 1), in which he alleged that Jay Surgent told him he would never be charged criminally (Ex. 1 at 2, 7.) and continually lied to him about matters relating to the investigation (Ex. 1 at 2.)

At the conclusion of the hearing, Your Honor found that no offer of immunity was extended by the government, nor was any such assurance made by Jay Surgent to the defendant. (Id. at 84.) To the extent that the defendant testified otherwise, the Court found that he did so falsely. (Id. at 84.) Your Honor also found that the defendant "knew precisely what he was doing" and that his waiver was made knowingly and voluntarily. (Id. at 88.) Thus, the defendant's testimony at the pretrial hearing and the statements contained in his affidavit establish a willful attempt to obstruct justice, and accordingly, the inclusion of two levels for obstruction of justice is required.

B. Fraud: Specific Offense Characteristics

The defense challenges three aspects of the Probation Department's findings within the Specific Offense Characteristics Section of the Guidelines (2F1.1(b)): (2) loss amount; (2) more than minimal planning; and (3) the involvement of sophisticated means. These challenges are without merit and should be rejected.

1. Loss

The Sentencing Commission has identified "loss" as a critical factor in assessing the relative seriousness of a fraud offense. It defines loss as the "value of the money, property, or services unlawfully taken" from the victim. (2F1.1, cmt. n. 8.) In the evaluation of loss, the Commentary to 2B1.1 defines loss as "the greater of actual loss or intended loss." (2B1.1, cmt. n. 8.) "Actual loss" is the "reasonably foreseeable pecuniary harm that resulted from the offense." (2B1.1, cmt. n. 3). "Intended loss" is "the pecuniary harm," i.e., harm that is "monetary" or "readily measurable in money," that was intended to result from the offense. (2B1.1, cmt. n. 3.) A defendant "is presumed to intend the natural and 'probable' consequences of [his] acts." United States v. Jacobs, 117 F.3d 82, 95 (2d Cir. 1997).

The PSR incorporates the correct Guideline for loss amount. The intended loss was clearly and credibly established through the evidence presented at trial. Peter Melley, a Criminal Investigator with the National Association of Securities Dealers, provided the following testimony about the loss generated by the Orex fraud:

> Q: Mr. Melley, have you had an occasion based upon your review of the documents to determine the total loss to customers based on the sales of Orex?
>
> A: Based on the activity in the audit trail, I was able to extract those transactions where customers purchased and sold Orex stock. Those would be customers market wide. So we are not just focusing on these five [brokerage] firms or any particular accounts. So for any customer between March and December of 1999, that purchased the stock and sold the stock, based on the audit trail, a loss amount was calculated in excess of forty-six million dollars.

(Tr. at 898-99.)

Despite this unchallenged trial evidence regarding loss, the defense comments, without further explanation, that the inclusion of the $40 million in the PSR overstates the defendant's responsibility. Not only is the loss calculation by Mr. Melley reasonable and straightforward, but it is based on a conservative approach to the computation. In his evaluation, Mr. Melley included only those victims who bought and sold Orex stock, and chose not to include the losses suffered by many of the victims who had not sold their stock by December 1999.

Although the inclusion of $40 million under the intended loss calculation is appropriate here, an actual loss evaluation of the fraud also results in loss to investors of at least $40 million. All of the steps undertaken by Surgent in the careful planning of the scheme reveal his determination to orchestrate a massive fraud that would rob investors of well in excess of $40 million. By his actions, it is clear that he planned to sell his endless supply of Orex stock for a

very long time. For example, he leased expensive penthouse office space and hired a staff for his fictitious company. (Tr. at 333.) He went to the financial and logistical trouble of producing a professional quality video, brochures, and a Web site. (Tr. at 401, 402.) He used family members and long-time employees as nominees and forged corrupt relationships with a market maker. Organized crime figures and others were recruited to sell the stock through Preferred Securities and other boiler rooms and Surgent demanded that the stock be held by the brokers for at least nine months. (Tr. at 375.) This conduct from a man who does not easily part with his money establishes not only his long-term commitment to the fraud, but also his view of the enormous profits it would yield.

The defense points out that the defendant's profit from the scheme was $2,500,000,[3] and in doing so is perhaps arguing in favor of a loss amount based on this figure. The Commentary in the Guidelines, however, states that the court is required to use the defendant's gain from the offense as an alternative measure of loss only if there is a loss that cannot reasonably be determined. (2B1.1, cmt. n. 3.) Here, analysis under both actual loss and intended loss results in a loss figure in excess of $40 million.

Finally, the defendant's request for a hearing pursuant to United States v. Fatico, 603 F.2d 1053 (2d Cir.1979), regarding loss amount should be denied. As noted above, we respectfully submit that the Court should rely on the loss amount established by the trial evidence. Although the Guidelines establish that disputed facts important to a sentencing determination permit the parties an opportunity to present information to the court (Guidelines 6A1.3.), the defense has made no showing to trigger a hearing. (See Def. Memo at 2.) Additionally, "[t]he district court is not required, by either the Due Process Clause or the federal Sentencing Guidelines, to hold a full-blown evidentiary hearing in resolving sentencing disputes. All that is required is that the court afford the defendant some opportunity to rebut the Government's allegations." United States v. Slevin, 106 F.3d 1086, 1091 (2d Cir.1996) (internal citations and quotation marks omitted). In this case, Surgent has not proffered any evidence to rebut the loss established at trial. In the absence of such a showing, the request for a hearing should be denied.

2. More Than Minimal Planning

Although it appears that the defense might object to the more than minimal planning enhancement (Def. Memo at 2.), it is correctly applied to the defendant's conduct. The Commentary to this Section explains that a two level enhancement is warranted if the fraud involved more planning than is typical for commission of the offense in a simple form if significant affirmative steps were taken to conceal the offense. (Guidelines 1B1.1, cmt. n. 1.)

In United States v. Rosen, 409 F.3 535, 552-53 (2d Cir. 2005), the Court of

---

[3] The evidence at trial established that the defendant's profit was approximately $4,000,000. (See Tr. at 1019-20.)

Appeals found that the more than minimal planning enhancement was properly applied to the defendant in a securities fraud case where the evidence included "a daisy chain of sales in order to inflate the price of [company] shares... orchestration was required in order to match purchases and sales among coconspirators, to have such purchases and sales occur repeatedly in order to create an impression of strong market demand for the shares, and to have a sufficient number of participants, with assigned transactional duties (buying, selling, brokering)." The crimes set into motion by Surgent involved not only the sort of planning described in Rosen, but also was designed to conceal the fraud and the defendant's involvement in it at every turn.

3. Involvement of Sophisticated Means

Sophisticated means is defined as especially complex or especially intricate offense conduct pertaining to the execution or concealment of a crime. (Guidelines 2F.1.1, cmt. n. 15.) Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore bank accounts also ordinarily would indicate sophisticated means. (Id.) Evidence presented at trial established that Surgent created fictitious companies and initiated two frauds through a reverse merger of a shell company (Tr. at 331, 445.), and wired the illicit proceeds to his coconspirators' off-shore Bahamian account. (Tr. at 409.) Surgent's criminal conduct falls squarely within the sort of conduct contemplated by this enhancement.

C. Money Laundering: Specific Offense Characteristic

The defense next objects to the Probation Department's: (1) inclusion of $2,354,800 as the value of the laundered funds; (2) use of the 2005 Guidelines for the money laundering Base Offense Level; and (3) inclusion of a four-level adjustment for the defendant's Role in the Offense. (Def. Memo at 3, Guideline 2S1.1(b)(2).)

First, the defendant now says that he has a "belief" that $500,000, which the government contends was laundered, was never sent to the off-shore account and the value of the laundered funds should therefore be reduced. (Def. Memo at 3.) The trial evidence, however, conclusively proved that $2,354,800 was laundered by the defendant. Additionally, Your Honor has made a finding that the amount of laundered funds was indeed $2,354,800 (Preliminary Order of Forfeiture, May 1, 2006 at 1, Ex. 2) In any event, beliefs expressed by the defendant that are not supported by proof should be dismissed. The Court has previously expressed skepticism about statements the defendant has made on his own behalf. (Tr. at 1241.)

Second, the defendant urges Your Honor to depart from the 1998 Guidelines Manual and consult the 2005 Manual for the computation of just one Section of the Guidelines. (Def. Memo at 3.) Once the appropriate version of the Guidelines Manual is determined, however, it must be applied in its entirety. This "one book rule" prevents a sentencing court from picking one provision from one version and another provision from an earlier version. See Guideline 1B1.11(b)(2); United States v. Stephaenson, 921 F.3d 438, 441 (2d Cir. 1990). Only subsequent amendments that clarify rather than make substantive changes that may be

considered when using the Guidelines Manual in effect on the date of the offense. See Guideline 1B1.11(b)(2); United States v. Lewis, 93 F.3d 1075, 1080 (2d Cir. 1996). Surgent's request that the 2005 Guidelines, which are more favorable to him on this issue, be used in determining the enhancement under this Section should therefore be denied.

Third, Surgent's Role in the Offense warrants a four-level adjustment per Guideline 3B1.1(a), which is applied "if the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." He contends that the enhancement is misapplied because the wiring of the money was 'directed' by the Preferred Securities brokers and did not involve five or more participants. (Def. Memo at 3.) Once again, the trial evidence thwarts Surgent's argument. This evidence established that just as the defendant was in charge of running the securities fraud aspect of the offense, he was also at the helm of the money laundering conspiracy. (Tr. at 461.) He was in control of the money. He decided how much and how often to pay the coconspirators who were doing his leg-work. (Tr. at 161, 189 -193, 202, 409.) He even paid for the brokers to travel to the Bahamas to pick up the money. (Tr. at 404.) Additionally, brokers' protestations and angry phone calls to Surgent when he was cheating them out of their cut of their money were ignored. His leadership role is apparent in his ability to control all of the money and decline to respond to the demands of his coconspirators.

D. Use of Special Skill

The defense points out that the inclusion of a two-level increase based on the defendant's use of a special skill during the commission of the crime is error and should be stricken from the PSR. (Def. Memo at 2.) We agree.

If a defendant abuses a position of public or private trust, or uses a special skill in a manner that significantly facilitated the commission of the offense, two levels are added. (3B1.3.) When this adjustment is based solely on the use of a special skill, as it would be in the instant case, however, it may not be employed in addition to an aggravating role adjustment under 3B1.1. The guideline calculation here properly includes an aggravating role adjustment and the special skill adjustment and is therefore not appropriate.

E. Multiple Count Adjustment

The defendant again asks the Court to put aside the 1998 Guideline Manual and consult Manuals from subsequent years so that he may benefit from the Guideline calculation under the Multiple Count Adjustment of the PSR. (Def. Memo at 3-4.) As noted above, the "one book rule" does not permit a defendant to pick and choose which of the Guideline Manuals benefits him on a given subject. Additionally, as the Probation Department explains in its Addendum to the Presentence Report dated today, a correct analysis under the defendant's theory would in fact result in the imposition a more substantial sentence.

F. The Plea Offer

The defense claims that the government believes that a four year sentence is appropriate because one of the plea offers extended to the defendant included a similar guideline range. (Def. Memo at 5.) Plea discussions or offers between the parties are not relevant to a defendant's sentencing.

Federal Rule of Criminal Procedure 11(e)(6), which is governed by Federal Rule of Evidence 410, protects the plea discussion process and aims to prevent precisely this sort of misuse of that process. Rule 11 establishes that the fact that the defendant or his counsel and the prosecuting attorney engaged in plea discussions or made a plea agreement should not be received in evidence against or in favor of the defendant in any criminal proceedings. (Rule 11 cmt. n. (e)(6)) Here, the defense ignores this well-established Rule.

G. Sentences Imposed In Other Cases

The defense includes in its submission a list of 'related cases' which recites sentences imposed on five defendants. (Def. memo at 4.) Counsel argues that the disparity between the sentence imposed upon these individuals and that which he faces is unfair. (Def. Memo at 5.) This argument should be rejected.

Generally, disparities between guideline ranges among co-defendants may not serve as a reason for departure. See United States v. Joyner, 924 F.2d 454, 459-61 (2d Cir. 1991). Even when there exists a significant disparity, for example by charge bargaining against a defendant against whom the government has a weaker case, the sentencing court may not correct it by granting a downward departure to a co-defendant who was unable to obtain such a favorable plea bargain. See United States v. Mitchell, 358 F.3d 216, 220 (2d Cir. 2004).

H. Organized Crime References

The defense asserts that the Probation Department has incorrectly portrayed the defendant's organized crime ties. (Def. Memo at 1.) We believe that the PSR's references to the defendant's relationships with organized crime figures and his business dealings with such individuals are accurate. In fact, the PSR only briefly touches upon Surgent's long-standing relationships with such individuals, about which the trial evidence revealed him to be so proud. (Tr. at 438.) The government therefore opposes any possible contemplation by the defense to strike such references from the PSR or otherwise interfere with the defendant's designation by the Bureau of Prisons.

I. Family Circumstances

The defendant argues that he is entitled to a lenient sentence because an extended absence would have a detrimental effect on his two youngest children. (Def. Memo at 5.) Reading this argument as a motion for downward departure from the advisory guidelines on the

basis of family circumstances, the government respectfully submits that nothing in the record supports such a departure.

Family ties and responsibilities are not ordinarily relevant in determining whether to depart. (Guideline 5H1.6.) Disruption of a defendant's life and the difficulties faced by those who depend upon him are inherent in the punishment of incarceration. United States v. Johnson, 964 F.2d 124 (2d Cir. 1992). A defendant's family responsibilities must be sufficiently extraordinary to justify consideration. See, e.g., United States v. Alba, 933 F.2d 1117 (2d Cir. 1991), United States v. Glante, 111 F.3d 1029 (2d Cir. 1997) United States v. Madrigal, 331 F.3d 258 (2d Cir. 2003).

The family hardship described in the defendant's motion is hardly of a type to justify a downward departure for extraordinary family circumstances because the defendant's absence from his two children is no different from the separation from family that many defendants face. The Court might also bear in mind the following two things. One, the defendant chose to have these children present in the courtroom during the trial and summations. He chose to expose these boys to the trauma of the trial and then watching agents of the United States Marshals Service take their father away after the verdict. Although we acknowledge that many defendants benefit from the support they receive from the presence of family members during the difficult experience of a trial, we submit that Surgent used these children in an effort to manipulate the jury, and is using them again in an attempt to manipulate this Court.

Additionally, the consequences of Surgent's fraud were devastating emotionally and financially to countless families in this country. Fred Kahl, for example, testified that the depletion of his life's savings has prevented him from seeing his three young grandchildren for two years. (Tr. at 69.) Joseph Goodin, the father of three young boys, testified that after depleting his family's savings, he borrowed $30,000 from his father to invest in Orex stock. (Tr. at 99.) An individual like the defendant who is so cavalier with the lives of others is in a particularly poor position to request leniency based on his own family ties.

J. Non-Guideline Sentence Under § 3553(a)

The government respectfully submits that, in light of the factors set forth in 18 U.S.C. § 3553(a), the government's view of the appropriate advisory Guideline range is reasonable and appropriate in this matter.

Under 18 U.S.C. § 3553(a), the sentence imposed in a particular case must, among other things, reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and prevent unwarranted sentencing disparities. In addition, this section directs the sentencing court to consider the

Sentencing Guidelines and applicable policy statement. See 18 U.S.C. § 3553(a)(4), (a)(5). Although United States v. Fernandez, ---F.3d---- 443 F.3d 19, 2006 WL 851670 (2d Cir. April 3, 2006), declined to hold that a sentence within the applicable Guideline range is necessarily presumptively reasonable, courts are still required to consider each of the 3553(a) factors prior to sentencing.

Interpreting the meaning of the provisions for the first time since the Supreme Court's decision in United States v. Booker, 125 S. Ct. 738 (2005), the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." Crosby, 397 F.3d 103, 111. Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

In two opinions, Judge Cassell of the District of Utah has provided thorough explanation as to why the Guidelines should be given "considerable weight" in sentencing. See United States v. Wilson, 350 F. Supp. 2d 910, 913-25 (D. Utah 2005) ("Wilson I"), on denial of motion for reconsideration, 355 F. Supp. 2d 1269, 1271-86 (D. Utah 2005) ("Wilson II"). As Judge Cassell observed, the Guidelines represent congressional intent with respect to appropriate punishment, because Congress empowered the United States Sentencing Commission to promulgate the Guidelines and has reviewed them over a period of over 15 years "to insure that they fulfill congressional purposes," and "the Guidelines reflect precisely what Congress believes is the punishment that will achieve its purposes in passing criminal statutes." Wilson I, 350 F. Supp. 2d at 915; see also United States v. Peach, 356 F. Supp. 2d 1018, 1021-22 (D.N.D. 2005) (Guidelines range provides a presumptively reasonable sentence for the district court to follow because the statutory purposes of sentencing, as directed by Congress, are best reflected in the Guidelines); United States v. Wanning, 354 F. Supp. 2d 1056, 1060 (D. Neb. 2005) ("The Guidelines and their ranges were explicitly crafted by the Sentencing Commission at the direction of Congress to implement the statutory purposes of sentencing.").

Indeed, in drafting the initial Guidelines, the Sentencing Commission

> examined the many hundreds of criminal statutes in the United States Code. It began with those that were the basis for a significant number of prosecutions and sought to place them in a rational order. It developed additional distinctions relevant to the application of these provisions and it applied sentencing ranges to each resulting category. In doing so, it relied on pre-guidelines practice as revealed by its own statistical analyses based on summary reports of some 40,000 convictions, a sample of 10,000 augmented presentence reports, the parole guidelines, and policy judgments.

Guidelines 1A1.1, Chapter One - Introduction And General Applicable Principles, 5: A

Concluding Note; see also Wilson II, 355 F. Supp. 2d at 1276. While the Sentencing Commission's judgment is no longer binding on district courts, the research and thought that went into creating the Guidelines should lend substantial weight to the reasonableness of any Guidelines sentence that a district court should choose to impose.

Wilson I also noted that the Guidelines represent what the public views as appropriate sentences for various offenses, 350 F. Supp. 2d at 917-18, that they are effective in serving crime control purposes, id. at 918-20, and that they are necessary to avoid unwarranted sentencing disparity, id. at 924-25, concluding that "the Guidelines should be followed in all but the most exceptional cases," id.

The relevant factors enumerated in § 3553(a) support a sentence within the advisory Guideline range. With respect to the nature and circumstances of the offense, Surgent committed a sophisticated and depraved crime that devastated countless victims, many of whom were elderly. The consideration involving the need to promote respect for the law is particularly poignant in the case of John Surgent in light of his troubling history in this area.[4] The issue of sentence disparity among those involved in the Orex fraud does not advance the defendant's argument either. This provision applies to unwarranted sentence disparities among individuals with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). (emphasis added.) There is no evidence that the defendants identified by the defense were similarly situated or engaged in similar conduct. Finally, we submit that the defendant's past repeated criminal behavior strongly suggests a disposition towards future criminal acts, from which the public must be protected. A lengthy sentence is necessary to protect the pubic from Surgent, reflect the seriousness of his crimes, promote respect for the law and provide just punishment.

---

[4] The defendant has displayed disdain for the laws of this country during the last 30 years. In September 1978, he was suspended from the practice of law by the Supreme Court of New Jersey as a result of ethics violations (PSR at 20-21, ¶ 91.), which apparently involved another Over The Counter stock manipulation. (PSR at 6, ¶ 11, at 21, ¶ 92.) Two years later, he was arrested for apparently filing a fraudulent bank loan application. (PSR at 15, ¶ 68.) Two years after that, he was convicted and sentenced to ten years incarceration in the Federal District Court in the Southern District of New York for a variety of charges, including securities fraud and subornation of perjury. (See Ex. 2.) In 1999, shortly after he was released from his period of probation, he committed the Orex fraud. The following year, he moved on to the MotorSports stock manipulation. (PSR at 9, ¶ 23.) Two years after that, he committed bankruptcy fraud. (PSR at 26, ¶ 154.) He has also filed inaccurate tax returns for several years. (See PSR at 23, ¶ 105.) In 1994, when he was arrested in connection with this case, he lied to Federal law enforcement agents. (PSR at 9 ¶ 25.) He lied again during several proffers at the U.S. Attorney's Office. During the pre-trial hearing before Your Honor, he committed perjury.

Conclusion

For the reasons set forth above, the government agrees that a two level reduction from the advisory Guideline range is appropriate, but respectfully submits that in all other respects, the Guideline calculation contained in the PSR is accurate.

Respectfully submitted,

ROSLYNN R. MAUSKOPF
United States Attorney

By: ______________________
Suzanne McDermott
Assistant U.S. Attorney
(718) 254-6459

cc: Clerk of Court (JG)
David Weiss, Esq.

# Exhibit 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------X

UNITED STATES OF AMERICA

-against-

JOHN SURGENT,

Defendant.

---------------------------X

CR04 364

AFFIDAVIT OF
JOHN W. SURGENT

STATE OF NEW JERSEY )
)
COUNTY OF BERGEN )

I, John W. Surgent, being of full age do hereby state as follows:

1. I am the defendant in the above-entitled action, and as such I am fully aware of the facts of the case.

2. I believe the present case against me is directly the result of either the purposeful conduct or the incompetence of my brother and former Attorney, Jay V. Surgent, ("Attorney Surgent"). During his representation of me, Attorney Surgent actions resulted in the following:

a. Alerted the United States Attorney's Office as to my possible criminal liability when there was not an existing criminal investigation into my activities.

b. Mislead me as to the Government's intentions toward prosecuting me in an attempt to induce me

to give proffers, stating that "I would never be charged with anything."

c. Continually lied to me about agreements he had with the United States Attorney to induce me to continue with the proffers. As a result of my reliance on his alleged agreements, I participated in four proffer sessions, which I would have not participated in but for said reliance.

d. Caused me to preclude any possible defense I might have to charges against me, after advising me to alert the government to said possible charges by way of my proffers and the proffer agreement.

e. Completely failed to become aware of the facts of the case, the applicable law, or federal criminal procedure. As a result of Attorney Surgent's complete ignorance of the facts of my case and of the adversarial process in general, Attorney Surgent provided me with nothing but damaging advice. Said advice provided by Attorney Surgent was based on no conceivable legal strategy or any other possible basis whatsoever given the facts

of the case, to which Attorney Surgent to this day is completely ignorant.

f. Had a conflict of interest in representing me, as Attorney Surgent (as I later became aware) was a principal organizer in a six million dollar stock fraud.

## Background

3. In November of 1999, I received a subpoena from the Securities and Exchange Commission requesting information and documents I had regarding Orex Gold Mines Corp. I had earlier in 1999 sold a substantial amount of Orex stock at a profit after which the stock price crumbled. When I received the subpoena I became unsettled due to my previous experience with government investigations as in the early eighties, after a trial, I was found guilty of securities violations. As a result of that conviction even though I paid complete restitution, and I had a recommendation for of a 0-6 month sentence, I was never-the-less handed a 10 year sentence, 2-b sentence making me ineligible for parole. I served 40 months of the 10 year sentence. Also as a result of this conviction I was disbarred from the practice of law.

4. I had the misfortune to receive a call from my brother Attorney Surgent while I was pondering the letter and my past experience with the government. I compounded my misfortune by making the mistake of mentioning to Attorney Surgent that I received a subpoena from the SEC. Attorney Surgent immediately suggested that he represent me in the matter and that he contact the SEC on my behalf. Although I had never thought much of Attorney Surgent's intelligence and skill as an attorney, (based on the fact that he had failed out of West Virgina School of Law and failed the New Jersey Bar the first four (4) times he attempted it) he assured me that over the past twenty years he had developed the ability to competently handle these types of cases. When I continued to be reluctant, Attorney Surgent, knowing of my previous conviction, played upon my fears and told me that the same thing was going to happen to me again, referring to my previous conviction and lengthy sentence. Attorney Surgent assured me that if I listened to him, I could avoid those problems. By the end of the conversation with Attorney Surgent I was in full fledged panic mode and I agreed to retain him and follow his advice.

5. Shortly after Attorney Surgent was retained, Attorney Surgent informed me that he contacted the SEC and

was told that there was an ongoing criminal investigation regarding OREX in the Eastern District of New York. Attorney Surgent then began a dialogue with the United States Attorney's office, and arranged for me to give a proffer. Although I was reluctant to give a proffer, Attorney Surgent assured me that he had spoken with the United States Attorney and that if I provided information to the government that I would not face criminal prosecution. I know now after speaking with my present representation that such a deal could not even be negotiated, as Attorney Surgent had no idea of the facts of the case, no idea as to what information I would provide to the government, no idea whether I would implicate any other individuals in any wrongdoing, no idea whether I would implicate myself in any wrongdoing, and no idea whether the government was interested in any of this information. Attorney Surgent advised me to make a statements which violated my 5th and 6th Amendment rights under the United States Constitution, without knowing what statements I would make, whether anyone was interested in hearing them, or whether making them would help me. Additionally, all of this happened prior to an indictment or any notification that there was a criminal investigation regarding my involvement, or any investigation or questioning from

Attorney Surgent to determine what possible charges could be brought against me and what possible defenses I could have.

6. Previous to my appearance at the proffers, Attorney Surgent suggested that I also hire Alan Zegas, Esq., ("Attorney Zegas") to also represent me. Although I did retain Attorney Zegas and he was present at all four proffers, I never discussed the facts of the case with him and he neither advised me to do a proffer or not do a proffer. It was my understanding that I was retaining Attorney Zegas to help and assist with Attorney Surgent's representation of myself. Although I retained Attorney Zegas, Attorney Zegas neither provided me with advice nor contributed to the legal strategy devised by Attorney Surgent. However, once I did begin the proffers Attorney Zegas encouraged me to continue by telling me that I was doing well. I paid both Attorney Surgent and Attorney Zegas the same amount for their representation $ 15,000 each.

7. As mentioned earlier I was reluctant to give the government information and only appeared at the proffer sessions and signed the proffer agreement because Attorney Surgent had given me his assurance that he had a deal with the United States Attorney and that I would not be

prosecuted. As such I never knowingly waived my rights as Attorney Surgent promised me that that there was an agreement in place and although I signed the proffer agreement it was just a formality and that I would not be prosecuted. Attorney Surgent continued to induce me to appear at the proffers in this manner by telling me that I was doing well and the government wanted more information. The promise from Attorney Surgent that I would not be prosecuted later changed after I had finished the fourth and last proffer. After the last proffer Attorney Surgent told me that I might have to go to prison but at most my exposure was at most 12 to 18 months in prison. I was shocked by this as I would have never appeared at the first proffer had I known that I could face prosecution. When I asked Attorney Surgent why would I have to face any prison when he said I wouldn't, Attorney Surgent told me that the government felt I had exposure and that they might charge me with a 10 year felony.

8. In all I appeared at four proffer sessions on; January 3, 2001, January 16, 2001, January 30, 2001, and February 21, 2001, additionally during these proffers I provided the government with over 1,000 pages of documents. Although Attorney Surgent advised me to present my entire file to the government, neither Attorney Surgent, nor

Attorney Zegas, ever reviewed any of these documents nor asked me what information these documents contained. The documents I presented at the proffers were later returned to me as the government's entire discovery disclosure. It appears the government did no independent investigation, and did nothing more than bates number stamp the documents I provided and returned the same to me. This is evidenced by the duplication and irrelevance of certain documents in the discovery disclosure, which is the normal practice for my files, which were provided to the government at the proffers. As proof that these document were provided by myself at the proffers, and not independently acquired by the government by other means, are the following examples of duplicates:

Duplicates are as follows, listed by the government's bates number: 01080 and 01089, 01099-01100 and 01095-01096, 01106 and 01091, 00908 and 00919, 00997 and 00998, 00999 and 01000. Additionally, 01098 is a Christmas card I received, and 01143-01144 is a yahoo printout regarding an unrelated company LRNN Accelerated Learning Language, Inc., a company which I had nothing to do with and is not the basis of any of the claims against me but was never-the-less in my file and is part of the government's discovery provided to me. As such it appears that not only did Attorney Surgent's

advice alert the government to a possible case against me, it also built that case for them so the Government did not have to do any investigation on their own.

9. I first learned that I was exposed to a lengthy prison sentence after Attorney Surgent and Attorney Zegas had their first meeting with AUSA Ronald White (the case had previously been handled by AUSA Jill Feeney), in the Summer of 2002. After this meeting Attorney Surgent informed me that I was facing a possible sentence under the guidelines of 78 months.

10. Following this shocking news I informed my brother George F. Surgent, Esq., also an attorney, about the situation which I had up until this time kept secret from him. George suggested that I hire Herald Price Fahringer, Esq., to review the matter. I relieved Attorney Surgent and Attorney Zegas of their representation of me, but by then the damage was done. Although I relieved Attorney Surgent of his responsibilities and was quickly coming to realize the magnitude of his errors, and the impact they would have on myself and my children, I still kept Attorney Surgent involved as he told me he was close with the Governor of New Jersey, James McGreevey, and that he could use his influence to help me out. As such I have even appeared before Your Honor with Attorney Surgent, and

requested that Attorney Surgent "straighten out the mess" with the government, as there is no further damage that he can do and he assured me he could be of help.

11. Most recently Attorney Surgent has sent a letter to the United States Attorneys with which he was dealing when he began his negotiations. This letter requested that they comply with their agreement, that I plead to a charge which carries a sentence of 12 to 18 months. Attorney Surgent has told me that he has received no reply to that letter. It is apparent that Attorney Surgent never had any deal worked out and either does not fully understand how negotiations are handled at this level or has purposely lied to me.

12. Although I was trained as an attorney I have not practiced law for over 20 years at the time I received the subpoena and as such I was nowhere near as knowledgeable as an attorney would be. Additionally, the panic I experienced at receiving the subpoena coupled with Attorney Surgent's inducements, and my past conviction negated any amount of formal training or common sense I had. Had I been in a better state of mind I may have realized the futility of Attorney Surgent's strategy. However, I relied upon his expertise and for that I am now placed at a severe disadvantage. Had Attorney Surgent done nothing, I would

be in a far superior position to which I now find myself. Attorney Surgent's complete incompetence or purposeful conduct has prejudiced my case beyond repair.

13. In addition to the above, I became aware after my proffers were completed, that Attorney Surgent was involved as a principal organizer in a six million dollar stock fraud. This fraud was perpetrated with an individual named Larry Paradise, formerly Larry Formato and involved a thinly traded stock named E-Line (ELINE). Mr. Formato had his name changed when he entered the witness protection program. It is my belief that Attorney Surgent may have been attempting to divert attention from himself by bringing me in for the proffers.

John W. Surgent

Sworn and subscribed to by me this 14th day of April, 2005

DOLORES BERGER
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Feb. 16, 2007

STATE OF NEW JERSEY
COUNTY OF BERGEN

# Exhibit 2

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the United States Courthouse in the City of New York, on the fourth day of January, one thousand nine hundred and eighty-three.

Present: HONORABLE WILLIAM H. TIMBERS,
HONORABLE JON O. NEWMAR,
HONORABLE LAWRENCE W. PIERCE,
Circuit Judges.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,
Appellee,

v. 82-1206

JOHN SURGENT, JR.,
Defendant-APPELLANT,

N.B. Since this statement does not constitute a formal opinion of this court and is not uniformly available to all parties, it shall not be reported, cited or otherwise and in unrelated cases before this or any other court.

**O R D E R**

John W. Surgent, Jr. Appeals from a judgment of conviction entered upon a jury verdict in the United States District Court for the Southern District of New York (Thomas P. Griesa, Judge). Appellant was charged with one count of conspiracy, six counts of selling unregistered securities, three counts of securities fraud, four counts of mail and wire fraud, and one count of subornation of purjury. 15 U.S.C. §§ 77(e), 77(x), 78j(b), and 78j (ff); 18 U.S.C. §§ 371, 1341, 1343, 1622, and 2. Appellant was found guilty on all counts and was sentenced to a total of ten years of imprisonment.

Appellant was a "control person" of "World Gambling", Inc. After appellant disseminated false reports regarding the prospects of that corporation, thereby inflating its over-the-counter price from $0.25 per share to $3.50 per share, 78,167 shares were sold

through four brokerage accounts maintained in the name of David Traxler. The jury was entitled to find that the shares held in Traxler's name were in fact owned by appellant, and that Traxler was used as a nominee owner in order to allow appellant to avoid the SEC filing requirements that are triggered where a "control person" trades in the stock of his own corporation. At trial, appellant did not contend that he was unaware that no filing had been made for the stock that was sold. Instead, his principal defense was that the stock owned by Traxler in substance as well as form, and therefore that appellant could not be found liable in connection with the sale of the unregistered shares.

Appellant's new counsel has advised that several of the points raised in appellants initial brief have been abandoned. Those that remain and those advanced and elaborated by new counsel are also without merit.

1. Appellant contends that the evidence did not permit a reasonable jury to find beyond a reasonable doubt that he was the real owner of the shares listed in Traxler's name. As collaborated at oral argument, this is not a claim that evidence from which appellant's ownership was inferable was not presented, such an argument would be totally unavailing. Instead, the claim is that it would have been reasonable for the jury to infer from the evidence that appellant was not the owner. This argument totally misconceives the Government's burden of proof under <u>United States v. Taylor</u>, 464 F.2d 240 (2d Cir. 1972). The proof need not be inconsistent with all plausible inferences of innocence; it must suffice to permit a reasonable jury to be persuaded beyond a reasonable doubt that the inference of guilt is the correct inference to be drawn. The evidence here was overwhelming, including the evidence of Surgent's efforts to have Traxler tell a false story to the Securities and Exchange commission concerning acquisition of the stock.

2. The charge on the mail and wire fraud counts is challenged for lack of sufficient language indicating that the mailings and wire communications must be in furtherance of the fraud. The language used in the initial charge drew no objection, and the supplemental charge focused the jury's attention sufficiently by stating the question to be whether the wire communication "was sent as a part of a fraudulent scheme." See Kamn v. United States, 323 U.S. 88, 95 (1944).

3. Appellant also contends that there was insufficient evidence that he induced Harry Poole, a business broker, to lie to the sec concerning Traxler's acquisition of the stock (Count 16). In response to the question, "What did Mr. Surgent say to you?", Poole answered " . . .it was said to me that, you know, 'Just tell him that he was a finder.'" Appellant suggests that the use of the passive voice renders the offerer of the instruction "unidentified" (Supplemental brief, p. 13). On the contrary, the jury was entitled to conclude that Poole was referring to Surgent, especially when a few questions later, he was careful to attribute to another person a different bit of instruction given to him concerning how he should claim he met Traxler. The evidence abundantly established Surgent's active role in orchestrating Poole's false testimony to the SEC.

Appellant's remaining claims are without merit. The judgment of conviction is affirmed. The mandate shall issue forthwith.

______________________________

______________________________

______________________________

**Circuit Judges**

Surgent

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the United States Courthouse in the City of New York, on the fourth day of January, one thousand nine hundred and eighty-three.

Present: HONORABLE WILLIAM H. TIMBERS,
HONORABLE JON O. NEWMAN,
HONORABLE LAWRENCE W. PIERCE,
Circuit Judges.

- - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,
Appellee,

v. 82-1206

JOHN W. SURGENT, JR.,
Defendant-Appellant.

- - - - - - - - - - - - - - - - -

N.B. Since this statement does not constitute a formal opinion of this court and is not uniformly available to all parties, it shall not be reported, cited or otherwise used in unrelated cases before this or any other court.

O R D E R

John W. Surgent, Jr. appeals from a judgment of conviction entered upon a jury verdict in the United States District Court for the Southern District of New York (Thomas P. Griesa, Judge). Appellant was charged with one count of conspiracy, six counts of selling unregistered securities, three counts of securities fraud, four counts of mail and wire fraud, and one count of subornation of perjury. 15 U.S.C. §§ 77(e), 77(x), 78j(b), and 78j(ff); 18 U.S.C. §§ 371, 1341, 1343, 1622, and 2. Appellant was found guilty on all counts and was sentenced to a total of ten years of imprisonment.

Appellant was a "control person" of World Gambling, Inc. After appellant disseminated false rumors regarding the prospects of that corporation, thereby inflating its over-the-counter price from $0.25 per share to $3.50 per share, 78,167 shares were sold through four brokerage accounts maintained in the name of David Trarlen. The jury was entitled

to find that the shares held in Traxler's name were in fact owned by appellant, and that Traxler was used as a nominee owner in order to allow appellant to avoid the SEC filing requirements that are triggered where a "control person" trades in the stock of his own corporation. At trial, appellant did not contend that he was unaware that no filing had been made for the stock that was sold. Instead, his principal defense was that the stock was owned by Traxler in substance as well as form, and therefore that appellant could not be found liable in connection with the sale of the unregistered shares.

Appellant's new counsel has advised that several of the points raised in appellant's initial brief have been abandoned. Those that remain and those advanced and elaborated by new counsel are also without merit.

1. Appellant contends that the evidence did not permit a reasonable jury to find beyond a reasonable doubt that he was the real owner of the shares listed in Traxler's name. As elaborated at oral argument, this is not a claim that evidence from which appellant's ownership was inferable was not presented; such an argument would be totally unavailing. Instead, the claim is that it would have been reasonable for the jury to infer from the evidence that appellant was not the owner. This argument totally misconceives the Government's burden of proof under United States v. Taylor, 464 F.2d 240 (2d Cir. 1972). The proof need not be inconsistent with all plausible inferences of innocence; it must suffice to permit a reasonable jury to be persuaded beyond a reasonable doubt that the inference of guilt is the correct inference to be drawn. The evidence here was overwhelming, including the evidence of Surgent's efforts to have Traxler tell a false story to the Securities and Exchange Commission concerning acquisition of the stock.

2. The charge on the mail and wire fraud counts is challenged for lack of sufficient language indicating that the mailings and wire communications must be in furtherance of the fraud. The language used in the initial charge drew no objection, and the supplemental charge

focused the jury's attention sufficiently by stating the question to be whether the wire communication "was sent as a part of a fraudulent scheme." See Kann v. United States, 323 U.S. 88, 95 (1944).

3. Appellant also contends that there was insufficient evidence that he induced Harry Poole, a business broker, to lie to the SEC concerning Traxler's acquisition of the stock (Count 16). In response to the question, "What did Mr. Surgent say to you?", Poole answered ". . . it was said to me that, you know, 'Just tell him that he was a finder.'" Appellant suggests that the use of the passive voice renders the offeror of the instruction "unidentified" (Supplemental brief, p. 13). On the contrary, the jury was entitled to conclude that Poole was referring to Surgent, especially when a few questions later, he was careful to attribute to another person a different bit of instruction given to him concerning how he should claim he met Traxler. The evidence abundantly established Surgent's active role in orchestrating Poole's false testimony to the SEC.

Appellant's remaining claims are without merit. The judgment of conviction is affirmed. The mandate shall issue forthwith.

[signature]

[signature]

[signature]

Circuit Judges.