**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SLR:KAN

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 27, 2008

**ELECTRONICALLY FILED**
**COURTESY COPY BY HAND**

Honorable Steven M. Gold
Chief United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. John Surgent,
Criminal Action No. CR-04-364 (Gleeson, J.) (Gold, Ch. M.J.)

Dear Chief Magistrate Judge Gold:

The United States respectfully submits this letter in response to the Court's August 6, 2008 Order and the discussion had at the August 12, 2008 telephone conference. Specifically, this letter will address how the Court should value contributions to RH Surgent LLC (the "LLC"), a Nevada limited liability company, in the event that the Court determines that such an analysis is appropriate to resolve the pending cross-motions for summary judgment in this ancillary proceeding. The factual bases for such an analysis are discussed at length in Point I, but, for the reasons set forth in Point II, the United States objects to this methodology.

## I. The Defendant's and the Claimant's Contributions to the LLC

As the Court is aware, the LLC was formed on or about August 16, 1999. Exhibit 1 at NEV 4-5.[1] However, Regina Surgent (the "Claimant" or "Ms. Surgent") purported to transfer title to 320 Algonquin Road, Franklin Lakes, New Jersey (the "Franklin Lakes property") to the LLC over one week before, on or about August 7, 1999. Exhibit 2. The LLC is a "non-

[1] All exhibits are attached hereto.

operating" company, and its sole asset is the Franklin Lakes property. Exhibit 3 at 84; Exhibit 5 at 47.

### A. The Claimant's Contributions to the LLC

The Court may employ any one of three different methods in analyzing Ms. Surgent's contributions to the LLC: (1) her own contemporaneous statements about the value of the Franklin Lakes property; (2) documents regarding the fair market value of the property; and (3) the housing price index. The government will consider each in turn.

#### 1. The Claimant's Representations at Time of Transfer

When Ms. Surgent recorded the deed transferring title of the Franklin Lakes property to the LLC, she noted that the transfer was exempt from real estate transfer taxes because she received less than $100 consideration. See Exhibit 2; Exhibit 4 at RS 5. See also N.J.S.A. 46:15-10(a). The statute addressing exemption from real estate transfer taxes specifically defines consideration as:

> the actual amount of money and the monetary value of any other thing of value constituting the entire compensation paid or to be paid for the transfer of title to the lands, tenements or other realty . . . .

N.J.S.A. 46:15-5(c). Therefore, according to Ms. Surgent's own sworn filing, she received an interest in the LLC worth less than $100 in exchange for transferring title to the Franklin Lakes property. The Court could – and indeed should – use this $100 figure to value her contribution to the LLC as it accurately reflects the farcical nature of the LLC and the transfer: Ms. Surgent held title in order to shield her husband's interests, and the LLC was merely another vehicle designed by the defendant to hide his assets from creditors.[2]

---

[2] Indeed, the Surgents' efforts to characterize the LLC as the Claimant's sole property are belied by their statements relating to the 2000 mortgage with Merrill Lynch Credit Corporation. In the "Consent of Members," the defendant and the Claimant represented under oath that they were "all the members" of the LLC. Exhibit 6 at PHH 429. Similarly, in the "Minutes of a Special Meeting of RH Surgent LLC," the defendant and the Claimant represented that they were "all of the partners" of the LLC. Id. at PHH 430. In the Limited Liability Company Rider, Surgent expressly represented, "The members of [the LLC] are as follows: John W. Surgent and Regina Surgent. The Manager of [the LLC] is John W. Surgent." Id. at PHH 227. Surgent has continued to hold himself out as a member of the LLC in the foreclosure litigation in New Jersey. See Exhibit 7 passim. Likewise, reliance upon New Jersey law for the period when the property was titled solely in Ms. Surgent's name is also misplaced, particularly given the undisputed facts regarding decision-making and financing (including the fact that the Hudson City Bank mortgage was solely in the defendant's name).

### 2. Fair Market Value at Time of Transfer: The December 1999 Appraisals

At the August 12, 2008 telephone conference, the Court suggested that it might be appropriate to estimate the value of Ms. Surgent's contribution based upon the fair market value of the Franklin Lakes property as of the date of transfer.[3] Aside from the Claimant's representation in the real property transfer tax form, there is nothing in the record establishing the home's value as of August 1999. That said, there are two appraisals, both from December 1999, that the bank obtained in connection with the mortgage that the Surgents obtained on the property. See Exhibit 6 at PHH 260-76, 541-45 (apparently retyped in part at PHH 279-81).

Both of the December 1999 appraisals valued the house at $3.3 million, Exhibit 6 at PHH 261 and PHH 280, but both appraisals were also "subject to completion as per plans and specs," id. at PHH 261 and 542. See also id. at PHH 544 (noting that "[t]he subject interior is currently incomplete"). The appraisers thus assumed that certain work that was promised to be done would, in fact, be done when they prepared their valuations. This is key. As the appraisers explained, valuing the Franklin Lakes property was somewhat difficult because there were no comparables in the same geographic area; the home was lavishly appointed, with all millwork "HANDCRAFTED AND HAND CARVED on site." Id. at PHH 544 (capitalization in original); see also id. at PHH 264. Accordingly, the appraisers employed both the cost method and comparable sales method to value the property. Although the Claimant's counsel has argued that the cost of a project may not translate into value, the record does not support that argument here. Instead, one appraiser found that the cost method approach "established a similar limit to value" as the sales comparison approach. Id. at PHH 261. The other observed that, while the "cost approach sets the higher end of value," it "support[ed] the Sales Comparison Approach." Id. at PHH 544. In other words, both methodologies yielded similar results, and cost is properly considered in computing the value at the time of transfer. Thus, because certain improvements had not yet been completed but were included in the appraised value, the Court must subtract from the $3.3 million the estimated cost of completion, at least as the bank and the appraisers understood it at that time. According to the "Completion Budget" submitted by the defendant, $543,173.00 was required to complete the renovation. Id. at PHH 188. The HUD1 prepared at the time of the closing likewise noted that $543,173.00 was required to complete the work contemplated at that time. Id. at PHH 419. Specifically, those funds were allotted for the completion of woodwork and cabinetry for the theater room and lower level; lighting fixtures for the interior and exterior; electronics for the theater and AV media systems; metalwork for the stairs, balconies, basement, and gates; plumbing; lumber and supplies; a tiled bathroom; completion of the hardwood floors; and completion of the exterior and interior electrical work.

---

[3] This analysis runs counter to that used by the Internal Revenue Service, which links tax basis, i.e., the purchase price, to an investor's capital account in the LLC. When contributions, such as real property, are encumbered and the LLC assumes that debt, the investor's tax basis and capital account in the LLC are re-adjusted as the debts are satisfied. See, e.g., 26 U.S.C. § 722; 26 C.F.R. § 1.704-3. Given the lack of evidence regarding the debts transferred to the LLC, this methodology is not addressed in this submission.

Id. at PHH 188.

Additionally the HUD1 notes a $396,827.00 "Budget Excess." Exhibit 6 at PHH 419. It is not clear whether this represents additional funds to be paid to contractors for work to be performed or liabilities transferred to the LLC for work already performed. Either way, that amount is properly subtracted from the fair market value.[4]

In addition to the subtractions for the completion costs, the Claimant's contribution must be further reduced to reflect the value of two bank loans (a mortgage and a line of credit) secured by the Franklin Lakes property at the time of its transfer to the LLC. See Exhibit 6 at PHH 334-37, 437, 419. According to the HUD1 issued at the time that the mortgages were re-financed, the pay-off amounts for the mortgage and home equity loan held by Hudson City Bank and PNC were $570,589.45 and $213,902.79 respectively, for a total of $784,492.24.[5] Exhibit 6 at PHH 419.

To the extent that the Court undertakes a fair market value analysis based upon the December 1999 appraisals, Ms. Surgent's contribution to the LLC should be calculated as follows:

$3,300,000.00 (Appraised Value)
-579,589.45 (Hudson City Loan)
-213,902.79 (PNC Loan)
-543,173.00 (Completion Cost)
-396,827.00 (Budget Excess)
$1,566,507.76.

[4] There is no dispute that the mortgage was obtained in order to fund the renovations at the Franklin Lakes property. Exhibit 5 at 74-75. If the budget excess represented costs already incurred, then the LLC's payment of those costs represents an assumption of Ms. Surgent's debt and the value of her contribution must be reduced accordingly. If it represents work yet to be done, then, for the reasons set forth above, that amount was included in the appraised value and should be subtracted from fair market value in order to calculate the Claimant's contribution.

[5] It would be unusual if the mortgage and line of credit did not to make some provision regarding transfer, as the banks' interests were secured by the Franklin Lakes property. (Typically, a homeowner would be required to obtain the lender's written consent in order to transfer title.) The record, however, does not include a copy of either the mortgage note or line of credit held by Hudson City Bank or PNC, and Ms. Surgent certainly has not produced any such documentation. (The mortgage itself was held by the defendant. Exhibit 6 at PHH 395-99.) The fact that the transfer took place at all indicates that the banks consented to it and did not view the transfer as adversely affecting their interests. It further supports the government's argument that Ms. Surgent did not view the LLC as a separate and distinct entity but instead as an extension of her and her husband. The transfer was, for all intents and purposes, a non-event.

### 3. Fair Market Value at Time of Transfer: The Housing Price Index

The difficulty with the analysis discussed above is that it credits Ms. Surgent with value added by virtue of her husband's thievery. Indeed, the Surgents had already made extensive renovations to the home before title was transferred to the LLC, and $1,051,832.62 of those renovations is directly traceable to the defendant's fraud.[6] Exhibit 14 (sum of pre-transfer expenses).

Assuming that the Court agrees that Ms. Surgent cannot claim an ownership interest in the Franklin Lakes property insofar as it is attributable to criminal proceeds, the question then becomes how to value the house as of the time of transfer so as to account for the investment of those monies. As reflected by the title search, the Surgents purchased the Franklin Lakes property in 1988 for $1.35 million. Exhibit 2. Excluding the costs of the renovations, how much did the home appreciate in value between the time of purchase and the 1999 transfer to the LLC?

The Office of Federal Housing Enterprise Oversight, an independent entity within the Department of Housing and Urban Development, publishes quarterly reports on the Housing Price Index (the "HPI").[7] The HPI measures average house price changes and serves as an indicator of house price trends in various geographic regions. http://www.ofheo.gov/hpi.aspx?Nav=269. Unfortunately, the agency's website does not contain any reports that would track New Jersey real property prices back to 1988, but its publicly available data do permit the Court to approximate the rate of appreciation applicable to the Franklin Lakes property.

The 1995 Fourth Quarter House Price Index states that New Jersey real estate had, on average, increased approximately 3.8% since 1990. Exhibit 15 (also found at http://www.ofheo.gov/media/pdf/4q1995hpi.pdf). Accordingly, assuming that the Franklin Lakes property had been purchased in 1990 and had appreciated at the average rate, the property would have been worth approximately $1,401,300 in 1995 ($1,350,000 x 1.038). The 1999 Fourth Quarter House Price Index reflects that New Jersey real estate had, on average,

---

[6] The parties have perhaps unnecessarily complicated this issue by their discussion of the "relation back doctrine." See, e.g., Memorandum of Law in Opposition to [the Claimant's] Motion for Summary Judgment at 11-12. The real issue is whether Ms. Surgent can demonstrate an interest in the home to the extent its value is attributable to criminal proceeds, as she concedes a certain portion of the house is. Regardless of when the government's interest in forfeitable property vests, does Ms. Surgent have an interest in the tainted proceeds superior to that of her husband? The government respectfully submits that she cannot have such an interest. See United States v. Henry, 64 F.3d 664, 1995 WL 478635 (6th Cir. 2005) (per curiam) (forfeiting as substitute property the portion of a home attributable to criminal proceeds).

[7] These reports are admissible as public records and reports under Rule 803(8) of the Federal Rules of Evidence.

appreciated approximately 6.5% since 1995. Exhibit 16 (also found at http://www.ofheo.gov/Media/Archive/house/4q99HPI.pdf). Therefore, assuming that the property appreciated at the average rate and excluding any value added by the renovations, the Franklin Lakes property would have been worth about $1,492,385 in 1999 ($1,401,300 x 1.065). Of course, these figures do not account for any issues that may have affected property values in the Borough of Franklin Lakes specifically, nor do they account for any appreciation between 1988 and 1990. However, they do provide the Court with the tools to calculate a rough estimate of the home's value.

The record does not provide the Court with a rational basis for choosing among these valuation methodologies, each of which presents its own unique issues when applied to the facts of this case. However, as set forth in Point II, the United States respectfully submits that valuing the parties' respective contributions to the LLC is not the appropriate analysis. The undisputed evidence establishes that the LLC was incorporated in order to hide assets and operated as the defendant's alter ego. The Claimant's unsupported protestations to the contrary are not sufficient to defeat the government's summary judgment motion.

**B. The Defendant's Contributions to the LLC**

Whether the Court construes the LLC as an alter ego or a legitimate investment vehicle, the defendant financed all of its expenses. Ms. Surgent testified at her deposition that she has not worked since her marriage to the defendant in 1981. Exhibit 5 at 7-8, 66-67, 119-20. Therefore, there can be no dispute that all payments toward the mortgage and line of credit and other expenses associated with maintenance of the Franklin Lakes property – whether or not they were made from an account held in the Claimant's name – were funded by the defendant.[8] The Claimant's counsel has suggested that the defendant should not be given credit for such contributions to the LLC to the extent that they did not affect the value of the Franklin Lakes property. For example, counsel has argued that, because the Merrill Lynch mortgage provided for payments of interest only, Surgent's payments were not applied to the principal and therefore did not increase the LLC's equity in the home. There simply is no support for such a proposition which, in effect, conflates the Franklin Lakes property with the LLC. By paying the mortgage interest, Surgent paid one of the LLC's expenses, notably an expense that was required for the LLC to maintain its only asset. By virtue of such payments, Surgent thereby acquired an interest in the LLC. See, e.g., Nev. Rev. Stat. §§ 86.321, 86.341 (addressing contributions to and distributions from an LLC). How the LLC spent that money is irrelevant to this inquiry.

---

[8] This fact undermines any methodology whereby the Court, relying upon New Jersey law, credits the Claimant with sole ownership of the Franklin Lakes property until the 1999 transfer to the LLC. Indeed, if the Court were to consistently apply this analysis, Ms. Surgent should be credited with any post-transfer payments made toward the mortgage and other expenses if those payments came from an account titled in her name, accounts that, under New Jersey marital property law, were hers alone. However, there is no dispute that the defendant provided those funds to the Claimant. Moreover, such reliance upon New Jersey law would condone Surgent's blatant manipulation of title to shield his assets. Surgent, a life-long fraudster, was in bankruptcy and under indictment at the time that he funneled cash to his wife's accounts. The government submits that it is abundantly clear why payments were made in this manner.

How a payment to a corporation should be characterized is an issue that is frequently litigated in tax and bankruptcy cases. For example, a corporation may seek to characterize a payment as a loan so that it may deduct a portion of the repayment as interest. Alternatively, an individual may seek to characterize a payment as a loan so that, when the corporation fails to repay it, he may take a "bad debt" deduction. Similarly, in bankruptcy, where creditors have priority over shareholders, how such a payment is characterized may dictate whether the payor is able to recover. Regardless of the context, "[w]hether advances to a corporation are contributions to capital or loans is a question of fact that should take into account all the circumstances of a particular case." Gasser v. Infanti Int'l, No. 03-CV-6413, 2008 WL 2876531, at *8 (E.D.N.Y. July 23, 2008) (Glasser, J.) (citing Gilbert v. Comm'r of Internal Revenue, 262 F.2d 512, 513) (2d Cir. 1959) (internal quotation marks omitted).

In order to determine whether an advance is a capital contribution or a loan, courts look at three general categories of criteria:

(1) the form of the instrument documenting the advance;
(2) the intent of the parties; and
(3) the "objective economic reality as it relates to the risks taken by investors."

Gasser, 2008 WL 2876531 at *8 (quoting Fuscaldo v. United States, 00-CV-2486, 2001 U.S. Dist. LEXIS 18830, *5 (E. D. Pa. Oct. 30, 2001). As the court observed in Gasser, these three categories summarize a number of factors, including, but not limited to, the presence or absence of a fixed maturity date and schedule of payments; the presence or absence of a fixed rate of interest and interest payments; the source of repayments; the adequacy of the company's capitalization; the identity of interest between the creditor and the stockholder; and the corporation's ability to obtain financing from outside lending institutions. Id. at *8 n.9. See also Roth Tube Co. v. Comm'r of Internal Revenue, 800 F.2d 625, 630 (6th Cir. 1986); Laidlaw Transp. v. Comm'r of Internal Revenue, T.C. Memo 1998-232 (U.S. Tax Ct. 1998), 1998 WL 345528, at *22 (discussing factors considered in Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972)). Here, of course, there is no "debt instrument," schedule of payments, or fixed interest rate. The LLC operated as the defendant's alter ego, and it is clear that the LLC could not have obtained outside financing to pay its mortgage.[9] The defendant therefore holds an equity stake in the LLC.

This conclusion is only reinforced by the fact that the parties clearly intended the defendant to be treated as a shareholder. Their statements to Merrill Lynch evidence this intent, see supra n.2, as does the fact that Ms. Surgent had no means of repaying any debt unless and until the LLC generated profits or sold the Franklin Lakes property. Indeed, one of the primary considerations in a debt-versus-equity analysis is whether repayment of the advance depended

---

[9] Even a cursory review of the mortgage file makes plain that the bank concerned itself with the defendant's income and ability to service the nearly $2 million loan. Ms. Surgent was not working and had no assets with which to re-pay the bank.

upon the corporation's performance, i.e., whether this was "risk capital" or an advance that was to be repaid no matter the company's fortunes. Gilbert, 262 F.2d at 514. While a "shareholder is an adventurer in the corporate business who takes the risk, and profits from success, the creditor, in compensation not for sharing the profits, is to be paid independently of the risk of success, and gets a right to dip into the capital when the payment date arrives." TIFD III-E, Inc. v. United States of America, 459 F.3d 220, 232 (2d Cir. 2006) (quoting Commissioner v. O.P.P. Holding Corp., 76 F.2d 11, 12 (2d Cir. 1935) (internal quotation marks omitted). See also Matthiessen v. Comm'r of Internal Revenue, 194 F.2d 659, 661-62 (2d Cir. 1952). Given these considerations, the defendant clearly was an investor in the LLC.

In short, if one were to treat the LLC as a legitimate entity, it is clear that the defendant's contributions to the LLC gave him an equity interest therein. The next question is how to value those contributions and his resulting interest. For the reasons set forth below, Surgent's contributions – which include payments toward the mortgages and lines of credit and improvements to the home – should be valued, *at a minimum*, at $3.8 million, or approximately 61% of the LLC.

### 1. Mortgage and Line of Credit Payments

The parties do not dispute that the defendant financed the mortgages and lines of credit secured by the Franklin Lakes property, but the record does not include direct evidence as to the amounts of each of those payments. Nevertheless, the record does contain sufficient evidence for the Court to make reasoned estimates with respect to those contributions.

#### a. The Pre-Existing Mortgage and Line of Credit

As set forth above, when the Franklin Lakes property was transferred to the LLC, the property was encumbered by liens held by Hudson City Bank and PNC. While the record clearly reflects the pay-off amounts for those loans at the time that the Surgents closed on the Merrill Lynch loan, there is very little to indicate what the monthly obligations on those loans were between the August 1999 transfer and the January 2000 refinancing. The only document reflecting those obligations is a "Loan Consulting Worksheet." Exhibit 6 at PHH 53. According to that worksheet, the monthly payments totaled $8,315.00 ($5,658.00 for Hudson City and $2,657.00 for PNC). Assuming that those payments were made in September, October, November, December, and January, Surgent contributed $41,575.00 to the LLC, which the LLC in turn used to service the existing mortgages.

#### b. The Merrill Lynch Mortgage

The Surgents obtained a $1.75 million mortgage with Merrill Lynch Credit Corp. in January 2000. Exhibit 2. According to a Note Modification Agreement dated November 10, 2000, only interest was due on the Merrill Lynch mortgage until 2010, at which time, payments would constitute both interest and principal. Id. In the beginning, those monthly payments of

interest were $11,848.96. Therefore, assuming that the payments remained constant between January 2000 and December 2002, the next date for which there is any evidence regarding the monthly payment, Surgent paid $284,375.04 ($11,848.96 x 24 months).[10] Between December 2002 and January 2006,[11] there are only scattered records reflecting the payments toward the Merrill Lynch mortgage (thereafter assigned to Cendant and PHH), which are summarized below:

| Date | Amount | Source Document | Exhibit Reference |
|---|---|---|---|
| 12/30/2002 | $15,312.51[12] | Sterling Business Group Bank Records | Exhibit 11 at SGB 53 |
| 3/12/2003 | $9,114.58 | Sterling Business Group Bank Records | Exhibit 11 at SGB 73 |
| 3/19/2003 | $4,557.29 | Sterling Business Group Bank Records | Exhibit 11 at SGB 9 |
| 10/24/2003 | $4,192.71 | Merrill Funding LLC Bank Records | Exhibit 12 at FLT 19 |
| 12/24/2003 | $4,192.71 | Merrill Funding LLC Bank Records | Exhibit 12 at FLT 38 |
| 2/1/2005 | $6,316.28 | Claimant's Production | Exhibit 4 at RS 20 |
| 8/9/2005 | $7,109.37 | Claimant's Production | Exhibit 4 at RS 38 |
| 9/7/2005 | $7,473.96 | Claimant's Production | Exhibit 4 at RS 37 |
| 3/1/2005 | $6,316.28 | Claimant's Production | Exhibit 4 at RS 20 |
| 8/11/2005 | $7,109.37 | Claimant's Production | Exhibit 4 at RS 23 |
| 11/10/2005 | $8,020.83 | Claimant's Production | Exhibit 4 at RS 35 |
| 1/13/2006 | $17,609.20[13] | Claimant's Production | Exhibit 4 at RS 36 |
| **TOTAL** | **$97,325.09** | | |

[10] There is nothing in the record indicating what the monthly payments were between January 2000 and November 2000, when the modification was executed. While the mortgage file contains print-outs that appear to reflect an account history, the print-outs are not self-explanatory. Further, the original note was not filed with the County Clerk, and Ms. Surgent has not produced a copy of it. Notably, despite claiming to be the sole shareholder and "Managing Member" of the LLC, Ms. Surgent's knowledge of the LLC's operations (or rather, her lack thereof) is remarkable. Indeed, the *entirety* of her production in this ancillary litigation – all of forty-two pages (many of which are duplicates) – is attached hereto as Exhibit 5. It simply defies comprehension that she can claim ownership of a multi-million dollar asset but have so little documentation to back that assertion; she claims not to have in her possession any of the documents relating to title, the existing debt, payment of expenses, etc. Any assertion that her husband had no role in the LLC and that she managed its affairs is belied by her woefully inadequate production and repeated assertions that her husband or accountant "dealt with those things." Exhibit 5 at 77.

[11] The Surgents stopped paying the mortgage in or about January 2006. Exhibit 5 at 79-80; Exhibit 13 at 23.

[12] Because this payment is so much larger than those surrounding it, the government assumes that it represents two months' payments.

[13] Because this payment is so much larger than those surrounding it, the government assumes that it represents two months' payments.

Assuming fourteen payments are reflected in the chart, the payments average $6,951.80. Therefore, by applying this average to the remaining months – January 2002 to January 2006 – Surgent contributed an additional $340,638.20 ($6,951.80 x 49 months) to the LLC. Accordingly, the record supports the conclusion that Surgent paid at least $625,013.24 ($284,375.04 + $340,638.20) to the LLC for the Merrill Lynch mortgage.

**c. The Summit Bank Line of Credit**

In addition to the Merrill Lynch mortgage, the Surgents took out a $500,000 line of credit with Summit Bank in November 1999. Exhibit 2. The note outlining repayment obligations was not recorded with the title, and Ms. Surgent has not produced *any* documentation regarding this debt except for a handful of bills and bank statements. The paltry documentation provided by Ms. Surgent reflects the following payments:

| Date | Amount | Source Document | Exhibit Reference |
|---|---|---|---|
| 5/12/2005 | $4,475.29[14] | Claimant's Production | Exhibit 4 at RS 21 |
| 6/13/2005 | $2,441.23 | Claimant's Production | Exhibit 4 at RS 22 |
| 8/12/2005 | $2,547.39 | Claimant's Production | Exhibit 4 at RS 25 and RS 39 |
| 9/12/2005 | $2,547.40 | Claimant's Production | Exhibit 4 at RS 37 |
| 11/9/2005 | $2,759.66 | Claimant's Production | Exhibit 4 at RS 35 |
| 1/17/2006 | $5,639.16[15] | Claimant's Production | Exhibit 4 at RS 36 |
| **TOTAL** | **$20,410.13** | | |

Subtracting the finance charge, see n.14, the payments referenced above total $18,159.46. Assuming that they represent seven payments, they average $2,594.21. Applying the average of these payments to the period in question (November 2000 through January 2006) and then adding back the May 2005 finance charge, Surgent paid $163,091.69 to service the line of credit (($2,594.21 x 62 months) + $2,250.67). Notably, this calculation likely understates Surgent's contributions as interest rates dropped considerably between 2000, when the note was signed, and 2005, when the record first reflects any payments.

The defendant's payments towards mortgages and lines of credit therefore may be calculated as follows:

---

[14] This payment appears to include a finance charge of $2,250.67. Accordingly, while the entire amount will be counted towards Surgent's contribution, only $2,224.62 ($4,475.29 - $2,250.67) will be included in the average calculation.

[15] Because this payment is so much larger than those surrounding it, the government assumes that it represents two months' payments.

$41,575.00 (Hudson City and PNC Payments)
+$625,013.24 (Merrill Lynch)
+$163,091.69 (Summit Bank)
$829,679.93

**2. Improvements**

**a. Post-Transfer Improvements**

According to the undisputed testimony submitted in support of its motion for summary judgment, the Surgents spent more than $4 million renovating the Franklin Lakes property. Exhibit 8. It is further undisputed that Surgent invested more than $1.9 million of proceeds traceable to the Orex fraud into renovations at the Franklin Lakes property, both before and after the transfer of title to the LLC. Exhibit 14. The Court, however, has asked the parties to quantify Surgent's contribution to the LLC – whether or not traceable to the fraud – after the August 1999 transfer of title. The transfer, of course, post-dates many of the expenses paid for with stolen investor money, and such an approach allows defendants, like Surgent, to insulate their ill-gotten gains by manipulating title. Nevertheless, the government can readily quantify Surgent's post-transfer contributions by consulting the spreadsheet prepared by Surgent's accountant, Steven Gannuscio, and introduced at Surgent's trial (the "Gannuscio spreadsheet"). According to the Gannuscio spreadsheet, between August 10, 1999 and May 17, 2001, Surgent contributed $1,220,976.06 toward renovations at the Franklin Lakes property.[16]

Notably, the Gannuscio spreadsheet does not include any disbursements between October 20, 1999 and January 28, 2000. See Exhibit 8. However, according to the expense report given to Merrill Lynch, Surgent continued with the renovations during this period, spending an additional $232,370.66 between October 20, 1999 and December 9, 1999.[17] Therefore, by adding the figures on the Gannucsio spreadsheet to those submitted to the bank, Surgent contributed $1,453,346.72 to the LLC for improvements to the Franklin Lakes property.

---

16 A copy of the Gannuscio spreadsheet is attached hereto as Exhibit 8. Attached hereto as Exhibit 9 is an Excel spreadsheet summarizing the expenses noted on the Gannuscio spreadsheet between August 10, 1999 and May 17, 2001.

17 The disbursements, which are culled from Exhibit 6 at PHH 282-88, are summarized in the chart attached as Exhibit 10.

**b. Pre-Transfer Improvements Funded by the Fraud**

To the extent that the Court adopts the analysis discussed at the August 12, 2008 telephone conference, and to the extent that the Court adopts the December 1999 appraisals as the baseline for valuing the property (which, as set forth in Point II, it should not do), the government urges it to include in the defendant's contributions any pre-transfer monies invested in the renovation that are traceable to the Orex fraud. The defendant should not be permitted to shield stolen money from recovery by investing it in an asset titled in his wife's name. According to Exhibit 14, before he transferred title to the LLC, Surgent used $1,051,832.62 traceable to the Orex fraud to fund renovations to the Franklin Lakes property.[18] Ms. Surgent cannot claim that property as her own.

**3. Other Payments**

As Ms. Surgent had no source of income apart from her husband, there is no dispute that the defendant financed all of the LLC's other expenses. Unfortunately, the record is far from clear as to what those expenses might be. For example, most mortgage companies require a homeowner to maintain insurance on the property. While the mortgage file reflects the issuance of insurance in 2000 at a cost of $3,819.00, there are no other such documents in the record. Exhibit 6 at PHH 580. Assuming that the Surgents maintained insurance at a comparable level through 2006, the defendant paid an additional $26,733 of the LLC's expenses. Likewise, the record reflects that Ms. Surgent paid Incorp. Services (the agent for service of process in Nevada) $224.00 in 2005 and 2006. Assuming that the LLC incurred similar expenses each year since incorporation, those costs total $1,792.00. Also, in 2003, Surgent paid the Borough of Franklin Lakes $38,806.61. Exhibit 11 at SGB 59. The memo line on the check is blank, but one can only assume that these monies were used to pay real estate taxes or other obligations due to the borough. These payments to insurance, the registered agent, and borough total $67,331.61.

Clearly, there were other expenses associated with the Franklin Lakes property. Indeed, the photographs of the property and the list of renovation expenses reflect extensive landscaping, but it not apparent from what account (or in what amounts) subsequent landscaping bills were paid. Accordingly, the government has not included any estimates with respect to landscaping in its calculation of Surgent's contribution. Similarly, Irena Figiel worked at the Franklin Lakes property in connection with the renovation. See Exhibit 5 at 95-96; Exhibit 8 passim. However, she also worked as Ms. Surgent's housekeeper. Exhibit 5 at 95. The checks issued to her in 2003 do not reflect whether they constituted payment for housekeeping services (a personal expense) or for work related to the renovation (an LLC expense). See Exhibit 11 at SGB 48, 57, 58, 75. Given their timing, and construing the facts in the light most favorable to

18 The December 1999 appraisals necessarily include the value added by the pre-transfer renovations; the HPI method does not. Accordingly, the Court should not include this figure in Surgent's contribution if it has calculated the Claimant's contribution based upon the HPI.

the Claimant, the government construes these checks as personal expenses and has not included them in its calculations.

**C. Calculations**

If the Court is able to decide upon a methodology, it must sum the defendant's and the Claimant's contributions and determine their respective percentage interests in that total. That percentage represents their respective interests in the LLC and their share of the net proceeds of the Franklin Lakes property. So, for example, if Ms. Surgent contributed $1.5 million and the defendant $2.5 million, then Ms. Surgent has a 37.5% interest in the LLC and the defendant has a 62.5% interest. Two of the possible computations are set forth below:

*Example 1:*

| | |
|---|---|
| The Claimant's Contribution | |
| (Appraised Value) | $1,566,507.76 |
| The Defendant's Contribution | |
| (Mortgages and LOC) | $829,679.93 |
| (Post-transfer Improvements) | $1,453,346.72 |
| (Pre-transfer Improvements) | $1,051,832.62 |
| (Other Expenses) | $67,331.61 |
| Defendant's Subtotal | $3,402,190.88 |
| TOTAL | $4,968,698.64 |

Under this scenario, the Claimant is entitled to 31.5% of the net proceeds of the Franklin Lakes property, the LLC's only asset, and the United States is entitled to the defendant's 68.5%.

*Example 2:*

| | |
|---|---|
| The Claimant's Contribution | |
| (HPI) | $1,492,385.00 |
| The Defendant's Contribution | |
| (Mortgages and LOC) | $829,679.93 |
| (Post-transfer Improvements) | $1,453,346.72 |
| (Other Expenses) | $67,331.61 |
| Defendant's Subtotal | $2,350,358.26 |
| TOTAL | $3,842,743.26 |

Under this scenario, the Claimant is entitled to a 38.9% share of the LLC, and the United States is entitled to the defendant's 61.1% share.

## II. New Jersey Law Should Not Govern the Court's Analysis

The foregoing discussion is largely academic as it presumes that the LLC is a legitimate entity instead of a nominee or a shell used to frustrate enforcement of Surgent's financial obligations toward his victims. Similarly, the foregoing presumes that Surgents are permitted to use New Jersey marital property law to shield the defendant's assets from forfeiture. Neither presumption is warranted or indeed supported by the case law.

Under 21 U.S.C. § 853(n)(6), a claimant must establish a "legal right title or interest" in the subject property. In order to determine whether the asserted right defeats the forfeiture, in whole or in part, the Court must first look to the jurisdiction that created the property right, in this case, New Jersey (or Nevada, depending upon how the inquiry is framed). If the claimant does not have a valid interest under the applicable state law, then the inquiry ends and the claim must be rejected. If, however, the claimant does have a valid interest, then the Court must turn to federal forfeiture law. United States v. Timley, 507 F.3d 1125 (8th Cir. 2007). The Claimant does not contest this proposition. See Steven L. Kessler, Civil and Criminal Forfeiture: Federal and State Practice, §4:24 n. 11 (March 2008 Supp.) ("[I]n determining whether a party has a valid legal interest, the court must first look to the law of the jurisdiction that created the property right and then at the ancillary hearing, it must look to federal law to determine if the claimant will prevail in the ancillary proceeding") (citing United States v. Timley, 507 F.3d 1125 (8th Cir. 2007)). The Court may look to state law to evaluate a claim only insofar as state law does not frustrate a federal interest, United States v. Totaro, 345 F.3d 989, 994 (8th Cir. 2003), and, when state and federal law conflict, "federal law prevails under the Supremacy Clause," United States v. Fleet, 498 F.3d 1225, 1227 (11th Cir. 2007); see also United States v. Kennedy, 201 F.3d 1324, 1334 (11th Cir. 2000) (state law determines what interest a petitioner has, but federal law determines whether that interest is forfeitable); United States v. Speed Joyeros, S.A., 410 F. Supp. 2d 121, 125 (E.D.N.Y. 2006) (Weinstein, J.) (law of jurisdiction creating the property interest determines what interest the claimant has, but federal law determines whether that interest satisfies the requirements of the federal forfeiture statute); United States v. Hayes, No. 05-50045, 2006 WL 1228972, at *3 (W.D. La. May 4, 2006) (same). In sum, "having an interest in the property under the law of the jurisdiction that created the property interest . . . is not sufficient to permit a third party to successfully challenge the forfeiture of the property in the ancillary proceeding." Stefan D. Cassella, Asset Forfeiture Law in the United States, §23:12 (1st ed. 2006).

Neither Ms. Surgent nor the LLC have an interest sufficient to defeat the forfeiture in this ancillary proceeding. The government discussed federal law governing nominee ownership at length in its previous submissions and will not repeat that discussion here, but the government does reiterate that the undisputed evidence regarding the financing and operation of the LLC overwhelmingly establish that the LLC (and Ms. Surgent, during the time she claims

sole individual ownership of the Franklin Lakes property) is a mere nominee. As a nominal owner, regardless of the protections that New Jersey law may afford her, the Claimant simply cannot establish her entitlement to "100%" of the Franklin Lakes property.

The United States respectfully requests that the Court order: first, the forfeiture of the Franklin Lakes property insofar as its value is attributable to the investment of criminal proceeds; and thereafter, one half of the remaining value (Surgent's marital interest).[19]

## III. <u>Other Outstanding Matters</u>

To the extent that the Court determines that there are disputed issues of fact necessary to resolution of the pending motions, the United States requests that those facts be resolved at a hearing.

With respect to the proposed Amended Preliminary Order of Forfeiture submitted to Judge Gleeson on August 11, 2008, the United States provided the Claimant's counsel with a proposed Stipulation on August 18, 2008 and awaits comments.

Thank you for Your Honor's consideration of this submission.

Respectfully submitted,

BENTON J. CAMPBELL
United States Attorney

By: /s/______________________
Kathleen A. Nandan
Assistant U.S. Attorney
(718) 254-6409/7000

---

19 To the extent that the Court does not simply subtract the $1.9 million of criminal proceeds from the net proceeds of the sale of the property, it may calculate the $1.9 million as a percentage of the value using either of the methods discussed in Point I to estimate value as of 1999. For example, assuming that the home was worth approximately $1.4 million (HPI) and that Surgent invested $1.9 million of criminal proceeds in the property (which together approximates the $3.3 million appraised value), then the criminal proceeds represent 57.6% of the home's value as of 1999. Therefore, assuming that the parties' shared in any appreciation and/or depreciation in accordance with their respective interests, the government should be entitled to 57.6% of the net proceeds as traceable to the fraud and 50% of the remainder as representing Surgent's marital interest, for a total 78.8% of net proceeds. This may be calculated as: [0.576Net + (0.424Net/2)] = 0.788Net.

cc: By ECF and U.S. Mail

Steven L. Kessler, Esq.
Attorney for Regina Surgent
The Chanin Building
122 East 42nd Street
New York, NY 10168

Attachments:

| **Exhibit No.** | **Description** |
|---|---|
| Exhibit 1 | Excerpts from filing with Nevada Secretary of State regarding the LLC |
| Exhibit 2 | Title Search on the Franklin Lakes property |
| Exhibit 3 | Excerpts of prior deposition testimony |
| Exhibit 4 | The Claimant's production in this case |
| Exhibit 5 | Excerpts from the Claimant's deposition |
| Exhibit 6 | Excerpts from the Merrill Lynch mortgage file |
| Exhibit 7 | Excerpts from the New Jersey foreclosure litigation |
| Exhibit 8 | Gannuscio spreadsheet |
| Exhibit 9 | Excel spreadsheet summarizing portion of Gannuscio spreadsheet |
| Exhibit 10 | Spreadsheet of additional renovation expenses |
| Exhibit 11 | Excerpts from Sterling Bankcorp. Bank records |
| Exhibit 12 | Excerpts from Merrill Funding LLC bank records |
| Exhibit 13 | Transcript of April 10, 2006 hearing |
| Exhibit 14 | Affidavit of John Ellis |
| Exhibit 15 | The 1995 Fourth Quarter House Price Index |
| Exhibit 16 | The 1999 Fourth Quarter House Price Index |