R. Surgent

You should also wait before you answer for me to finish the question. It's very common in every day speech to talk over one another. But because the court reporter can't take down both of us at the same time, we have to be very careful to wait for the other to finish asking the question, or answering.

If you don't understand a question that I ask you, please let me know and I will rephrase it. If you don't hear a question for any reason, please let me know and I will repeat it. If you answer the question, I will assume that you both heard and understood it, okay?

A Okay.

Q I expect this deposition to last for several hours. If you need a break, however, please let me know and we will take a break, okay?

A Okay.

Q Did you review any documents in preparation for today's deposition?

A Not really.



R. Surgent

Q What do you mean by "not really"?

A What documents were -- what documents was it that I was supposed to review?

Q I'm not implying that you were supposed to. I'm simply asking whether you did.

A No.

Q Is your full name Regina Surgent?

A Yes.

Q Do you have a middle name?

A I use the initial "H," which represents my maiden name.

Q What is that?

A Hoffman.

Q Is there a middle name?

A No.

Q Are you currently employed?

A No.

Q Have you ever worked outside the home?

A Prior to marriage, yes.



R. Surgent

Q When was your marriage?

A 1981.

Q So you worked outside the home sometime prior to 1981; is that correct?

A Yes.

Q What did you do at that time?

A Various -- various things. I sold insurance. I worked for a publisher who was bringing -- I was preparing her work for publication. I did the proofreading and getting the documents, you know, ready for the publisher. And, I mean, I can go on and on with odd jobs. I worked at the bridal shop. I worked at A&P. You know, I don't think you really want to know about these things, or do you?

Q Well, let me put it this way --

A I never had a, you know, what you would call a career.

Q Did you graduate from high school?

A Of course.

Q When did you graduate from high



R. Surgent

school?

A 1974.

Q Did you go to college?

A I went to school for court reporting.

Q When did you do that?

A Oh, I'm unclear on the year, but it must have not been too long after. I guess I strayed a little bit after high school and did not go to school, because I guess my parents were, you know, not very focused on helping me with my college education, but then I think it was '75, perhaps, or '76. I don't really recall.

Q Did you complete that course of training?

A No, I did not.

Q Do you have any other post high school education?

A No.

MR. KESSLER: You are referring to formal education?

Q Formal education, informal education, any type of -- whether it was

R. Surgent
Q What does it do?
A It doesn't do anything other than it's just -- it was to -- basically, the purpose, I was concerned about my real estate holdings and the fact that I had stepchildren that might be -- in case that anything happened in regards to like, you know, like my husband dying or me -- or myself dying or divorce or anything, that the assets were protected from any claims they might have against the properties that I owned.
Q What properties were held by R.H. Surgent LLC?
A Everything that we did own. I believe, it was Tallahassee -- oh, God, my eyes are burning. Tallahassee, Destin. I don't know if we owned Turnberry's at that time. If we did, they were in there, I'm not sure. And the New Jersey home.
Q 320 Algonquin Road?
A Yes.
Q Do you need to take a break for your eyes?



R. Surgent
A Yes. I need to get some water.
[A recess was taken.]
Q Did R.H. Surgent LLC own anything other than real property?
A I'm trying to recall. No, I think it was just property.
Q Does it still own all those properties that you mentioned before, Tallahassee, Destin, Algonquin?
A No.
Q What does it currently own?
A The Algonquin Road property. The only property that is left of those properties.
Q Does R.H. Surgent LLC have any bank accounts?
A No. It did.
Q I'm sorry, it did or --
A You know, I might be wrong, but it didn't have any activity.
Q Are there shareholders?
A No.
Q You described it as a trust earlier. Is that the legal vehicle that



R. Surgent
you understand it to be?
A I guess so. I guess you would say so. Not that I'm an attorney.
Q Does R.H. Surgent LLC have any employees?
A No.
Q Does it have a manager?
A Me.
Q What are the duties of the manager?
A Just to -- I mean, you know, it's just -- right now, it's just to take care of the properties. That's -- I mean, it holds -- it's something that is meant to oversee -- it oversees the properties.
Q Did R.H. Surgent LLC ever conduct any annual meetings?
A I guess I met with myself in regards to the house.
Q Did it keep any records with respect to these annual meetings?
A No. I don't know.
Q Is there someone who might know if R.H. Surgent LLC kept records of annual



R. Surgent
meetings?
A No. I don't think it was necessary to keep records of annual meetings, so I don't believe so.
Q Did R.H. Surgent LLC maintain any minutes?
A No.
Q Did R.H. Surgent LLC ever issue any resolutions?
A I don't recall.
Q Is there anything that might help you remember whether R.H. Surgent LLC ever issued any resolutions?
A I don't know.
Q Did R.H. Surgent LLC ever file any tax returns?
A I don't think so. Maybe. I don't see a reason for it to, so --
Q Did you ever prepare tax returns on behalf of R.H. Surgent LLC?
A No.
Q And as R.H. Surgent LLC's manager, would you have been responsible for the preparation of taxes if any, in

R. Surgent
credit at the time?
A I -- really, you know, I shouldn't have even said I think so. I don't really know. Somebody did.
Q Now, your husband had served some time in prison in the 1980s; is that right?
A Yes.
Q From when to when was he in jail?
A Let me think a minute.
MR. KESSLER: Objection. Is there relevance to this? Do you know the answer?
MS. NANDAN: Do you want to continue having speaking objections, Steve? If you want to argue with me about my questions, we can do it outside and off the record.
MR. KESSLER: If you remember, you can answer.
A 1983. He was incarcerated in 1983.
Q And when was he released?



R. Surgent
A I think 1985.
Q Did he contribute any money to the purchase price of 320 Algonquin Road?
A Probably. I don't know if -- I don't know, it could have -- I'm very vague about when my -- when my bonds were used to purchase the home. So I don't recall.
Q Do you have any documents that would help you remember who --
A I'm asking for them. I'm sorry.
Q I'm not referring specifically to the bonds. I'm asking if you have any documents at all that would help you remember as to who put up the money for the 1988 purchase of the home.
A No.
Q Was there a mortgage associated with this original 1988 purchase?
A It was probably, what I recall, the owner financing. So we were probably just paying a certain amount of money until we came up with a subsequent loan to pay the owner off. Because at that --



R. Surgent
what I believe, that then lowered the purchase price if we did that within a year or whatever. I don't recall the terms.
Q Do you have any documents with respect to this original mortgage?
A Everything that I have, I sent to my attorney and I think he's sent to you. I mean, I've dug everywhere looking for stuff. I don't know why it seems like even the title search isn't very clear, but everything that's anything related to 320 Algonquin is -- has been sent.
Q Now, at some point later, in 1995, title is put in your husband's name.
A 1995?
Q Well, let me take out the date. Do you recall that at some point title to the home was held in your husband's name?
A I know that at one point when he was going to apply for financing that he asked me to -- you know, to sign whatever I needed to sign, which I guess was, in fact, a transfer of ownership to his name



R. Surgent
so that he can apply for the financing, because I guess his credit was stronger, obviously, than mine, since I wasn't an actual working person.
Q When you say "financing," do you mean a loan?
A I believe so, yes.
Q Who was he asking to give him a loan at that time?
A I don't recall.
Q Do you know how much of a loan he was asking for?
A I don't recall. No.
Q Was he going to use the home, 320 Algonquin Road, as collateral for this loan?
A For the?
Q For the financing that he was hoping to get?
A For the financing for the same home?
Q Let me rephrase the question. Was it your understanding that by putting the title in your husband's name, your

74

R. Surgent
take out the mortgage, did John W. -- that's what I'm trying to figure out. Who took out the mortgage?
A I believe it's in John Surgent's name. Although I get mail. It says John Regina Surgent, so I don't know.
Q Why did you take this mortgage out?
A Why? Because -- why do we, you know, we had -- when -- we refinanced because we were doing a lot of renovation. So it was to pay for the renovation. Perhaps get a better interest rate.
Q Now, you had mentioned earlier that the renovations were roughly between '98 and 2000. Does that help you recall when this mortgage might have been taken out?
A No. Not really.
Q Who decided to get the mortgage to fund the renovations?
A Probably my husband.
Q Did you have any input in that decision?

75

R. Surgent
A No.
Q Did you have any objection to the house being used to secure this mortgage?
A I didn't really know that the house was used to secure the mortgage. It was just done.
Q The mortgage or the bank, rather, that issued this mortgage was at first Merrill Lynch; is that right?
A I don't really know.
MR. KESSLER: What was the name?
MS. NANDAN: Merrill Lynch.
MR. KESSLER: I thought you said "First Merrill Lynch."
MS. NANDAN: "At first."
MR. KESSLER: "At first," okay.
MS. NANDAN: The reason that I qualified it is I believe the mortgage has been reassigned a number of times.
A The company, yeah, kept changing

76

R. Surgent
its name. That's why I can't really answer that question. I know Merrill Lynch is somewhere, but I don't know what came first or what's last.
Q Well, at some point did a company called Cendant, C-E-N-D-A-N-T, did that hold a mortgage at some point?
A Perhaps. For -- you know, I get them mixed up, because we had different mortgages for different properties. And it's been, like I said, twenty years of names.
Q Does PHH ring a bell as a mortgage holder?
A PHH? Oh, it does, actually. I was almost going to say no, but something like that, yes.
Q Do you have a copy of the mortgage application?
A If I did have a copy of it, I would have sent it to my attorney.
Q Did you ever have a copy of it?
A I don't -- I don't know. You would assume -- I guess I would assume so

77

R. Surgent
that if there was an application that we would have had a copy of it.
Q Do you have any recollection --
A It probably just got sent to the bank.
Q Do you have any recollection of ever seeing or reviewing the mortgage application?
A No. My husband dealt with those things.
Q Okay.
A Or the accountant.
Q Over time, you've gotten bills or statements from the various mortgage companies; is that right?
A Yes.
Q Do you continue to get bills or statements from the mortgage companies?
A Yes. Although I don't open them. I have a pile.
MS. NANDAN: I believe that those also fall within the scope of our outstanding discovery requests, so I will renew my request for those now.

R. Surgent

THE WITNESS: It's just a bill.

Q Who, meaning person -- who was responsible for paying the mortgage on 320 Algonquin? You've mentioned Steve Gannuscio had some responsibility, but how did that work? The bill comes in, what happens?

A Well, I don't really know. Steve Gannuscio paid all the bills, so he managed all the accounts, I guess, being the bookkeeper. And he sent whatever was necessary out. And then once he was not around and my husband was incarcerated, I sent them out.

Q And from what account did you send these mortgage payments?

A My account, of course.

MS. NANDAN: Again, I call for production of these records, which are responsive to our outstanding discovery requests.

Q When was the last time that you paid the mortgage --



R. Surgent

MR. KESSLER: What are you asking me for? Are you asking for a copy of the bills?

MS. NANDAN: A copy of the bills, a copy of the checks.

MR. KESSLER: We've given you copies of the bills, but I will be happy to get you more current ones.

MS. NANDAN: I do not have copies of the bills. The nineteen pages that we marked as Exhibit 1 are the entirety of the production. My request is for copies of checks, copies of bills, any documents evidencing payment on the mortgages towards the house.

Q When was the last time that you paid the mortgage?

A I don't recall. Sometime in -- it's 2007?

MR. KESSLER: Sometime in 2007?

THE WITNESS: No, no, I was saying it's 2007?



R. Surgent

A I don't recall. Probably sometime in the beginning of 2006. I really don't recall.

Q Now, you had mentioned that the proceeds of this mortgage were used for the renovations; is that right? I just want to make sure I understand.

A Yes.

Q Now, there was also a line of credit taken out on the home; is that right?

A Yes.

Q That was taken out in 2000, roughly?

A You know, I don't know.

Q Why was that line of credit taken out?

A I don't know.

Q Who decided to take out the line of credit?

A Probably my husband. And then, you know, I went along with it. I don't remember anything about it, actually.

Q Do you recall any involvement



R. Surgent

with the application or the paperwork leading up to the line of credit?

A Not specifically.

Q Was Steve Gannuscio also responsible for making payments on this line of credit?

A I think so.

Q After your husband was incarcerated, were any payments on this line of credit made?

A Yes.

Q Who made those payments?

A I did.

Q Out of what account?

A Out of whatever account I had. I would probably -- I don't know. I guess the Bank of America which had the line of credit.

MS. NANDAN: Again, I call for production of those documents.

Q Do you know what the proceeds from this line of credit were used for?

A Probably to -- you know, I would assume that it went into the home,

R. Surgent
over which you may have control?
A No.
Q Now, we had talked a bit about renovations at the house. I'm going to ask you a few questions about that and about some of the people who may have performed some work for you.
Does the name Kuiken Brothers, K-U-I-K-E-N, sound familiar to you?
A That's a lumber company.
Q Angelo, A-N-G-E-L-O, Milele, M-I-L-E-L-E, & Sons?
A I believe that was a dumpster service. I believe.
Q Do you know who Land Concepts is?
A No. It may have been landscaping.
MR. KESSLER: Do you know that or are you guessing?
THE WITNESS: Guessing. It's hard to recall.
Q Do you know what a company



R. Surgent
called Essence of Green is?
A No.
Q Do you know what services Paul Aquila, A-Q-U-I-L-A, may have performed?
A No.
Q Do you know what services Daryl, D-A-R-Y-L, Smith may have performed?
A No.
Q Do you know who Irena, I-R-E-N-A, Figiel, F-I-G-I-E-L, is?
A Yes.
Q Who is that?
A She was a housekeeper. She -- she --
Q She was a housekeeper at 320 Algonquin Road?
A Yes.
Q Did she ever work at any other property that you own?
A No.
Q Now, you mentioned that you had been living in Florida during the renovations; is that right?
A Yes.



R. Surgent
Q Was your husband living at 320 Algonquin Road?
A No.
Q Was anyone living at 320 Algonquin Road during the time of the renovations?
A No.
Q Do you know what Ms. Figiel was doing with respect to the renovations at 320 Algonquin Road? What, if anything?
A Cleaning up. Heavy duty cleaning.
Q Did Ms. Figiel ever invest in any of your husband's businesses or projects?
A I don't know.
Q Now, Luis Acevedo, who is he?
A My friend.
Q Did he perform any work with respect to the renovations at the house?
A Yes.
Q What kind of work did he do?
A He was interior designer.
Q And tell me what kinds of things



R. Surgent
he did as an interior designer?
A Many. Many. He oversaw a lot of the -- you know, the construction, the plans, picked out things.
Q Did he arrange for delivery of furniture, as well?
A I'm sure.
Q Were there other vendors from whom you purchased or through whom you purchased furniture for the renovation?
A Yes.
Q Who were they?
A I don't know. You tell me, I'll answer if I know, but, again, you are talking about furniture companies?
Q Who may you have bought furniture from for the renovation?
A Well, there were various, various.
Q Did you buy any furniture from Beacon Hill Showrooms?
A Yes.
Q Did you do anything else with Beacon Hill Showrooms? Meaning, did they

R. Surgent

He was living there. My brother was living there, so he would have been the only -- he was the only one that would have wanted the home. He didn't have a home and he wasn't in a good situation, so my husband -- I do have some kind of recollection of him trying to get my brother to buy the house -- help my brother to, you know, to get a mortgage.

Q Was your husband involved with your brother in any other type of refinancing?

A That is what I don't know about. I know about -- I know about right after my mother's death when the house was in -- was left -- it was in -- it was in our names and he wanted it and my husband helped him, I think, acquire a mortgage, where we were paid off whatever.

Q Do you know what you were paid?

A I think about a hundred -- a hundred -- I don't know, somewhere in the low hundreds, $150,000, $125,000, $100,000, something like that. I don't



R. Surgent

recall.

Q Your brother is retired now; is that right?

A I don't know.

Q Did he used to work for Verizon?

A Yes.

Q You are aware that your husband is in bankruptcy; is that right?

A Yes. I don't know if he is technically still in it or what. I don't really know.

Q When did you learn that he had filed for bankruptcy?

A I can't recall.

Q Did you know about it at or about the time that it happened?

A I don't recall. He didn't always tell me everything.

Q He wouldn't tell you about a bankruptcy?

A Perhaps not. A lot he didn't tell me.

Q Now, you had mentioned that you haven't worked outside the home since the



R. Surgent

time you were married, right?

A Yes.

Q Did you ever ask anyone how you were paying your bills, since your husband was in bankruptcy and you were not working outside the home?

A I didn't even think about that. That happened -- you know -- you know, as far as I remember, he was in bankruptcy when, you know, all these problems happened, where he was, you know, he was then incarcerated and, you know, we lost all our homes and lost all our vehicles. All that was pretty much simultaneous, so everything was going downhill.

MS. NAÑDAN: I will have this marked as 8.

(Plaintiff's Exhibit 8 was marked for identification, as of this date.)

Q I am now showing you what has been marked as Government 8. It's a two-page document, Bates stamped SGB 29 and SGB 30.



R. Surgent

Have you ever seen this before?

A No. Never.

Q Do you have any understanding why your brother would have given Sterling Group Bancorp his IRA?

A Absolutely not. Maybe because he had problems with his brain, I don't know.

Q Did you ever have any conversations with anyone about your brother giving any money to Sterling Group Bancorp?

A I never had any conversations regarding Sterling Group Bancorp. I never knew anything about this. Find -- I found out after my husband's incarceration, that this was happening, or shortly prior thereto, I'm not sure, because I was extremely, extremely angry.

Q Why were you angry?

A Because I didn't want my husband having anything to do with my brother and -- you know, I had -- I was suspecting