UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA

                -against-

JOHN SURGENT,

                Defendant.
-------------------------------------------------------------X
GOLD, S., U.S.M.J.:

REPORT &
RECOMMENDATION
CR-04-364 (JG)(SMG)

## INTRODUCTION

On July 26, 2005, defendant John Surgent ("John")[1] was convicted of securities fraud and

conspiracy to commit securities fraud in violation of 15 U.S.C. § 78j(b) and 18 U.S.C. § 371 and

of participating in a money laundering conspiracy in violation of 18 U.S.C. § 1956(h). The

charges accused John of manipulating the price of stock in Orex Gold Mines Corporation and

transferring the profits he made outside of the United States to conceal them. Finding that the

property involved in the conspiracy to commit money laundering had a total value of

$2,354,800.00, the court entered a Preliminary Order of Forfeiture for that amount. *See*

Preliminary Order of Forfeiture, Docket Entry 147. The Order authorized the government to

forfeit the defendant's right, title, and interest in certain assets, including real property located at

320 Algonquin Road, Franklin Lakes, New Jersey (the "Franklin Lakes property"), and shares of

common stock in Safeguard Security Holdings, Inc. (the "Safeguard Shares").[2] *Id.* On August

11, 2008, the government moved for entry of an Amended Preliminary Order of Forfeiture that

---

[1]For the sake of clarity, John and Regina Surgent are referred to in this Report by their
first names.

[2]The Preliminary Order of Forfeiture also authorized forfeiture of certain other assets not
involved in the pending motions and which have since been forfeited. *See* Final Order of
Forfeiture, Docket Entry 254.

would include John's interest in R.H. Surgent, LLC ("the LLC"), the entity that now holds title to the Franklin Lakes property. Docket Entry 261.

On or about June 1, 2006, petitioner Regina Surgent ("Regina"), John's wife, filed a third-party ancillary claim, individually and as a principal of the LLC, asserting an interest in the Franklin Lakes property and the Safeguard Shares. Docket Entries 164, 165. United States District Judge John Gleeson subsequently referred Regina's claims to me for a Report and Recommendation. After undertaking extensive but ultimately unsuccessful efforts to settle the competing claims asserted by Regina and the United States, the government and Regina have now filed cross-motions for summary judgment. For the reasons stated below, I respectfully recommend that the motions be granted in part and denied in part.

## APPLICABLE LAW

### I. Criminal Forfeiture

When sentencing a person convicted of money laundering in violation of Section 1956, the court "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1). "Section 982 incorporates the forfeiture 'provisions' of the continuing criminal enterprise statute, 21 U.S.C. § 853, except for subsection (d)." *United States v. Kramer*, 2006 WL 3545026, at *4 n.5 (E.D.N.Y. Dec. 8, 2006). Property subject to forfeiture includes real property as well as "tangible and intangible personal property, including rights, privileges, interests, claims and securities." 21 U.S.C. § 853(b).

"Criminal forfeiture under Section 853 is an *in personam* proceeding, unlike civil forfeiture which is *in rem*," *United States v. Coleman Commercial Carrier, Inc.*, 232 F. Supp. 2d

201, 203 (S.D.N.Y. 2002). Thus, only property owned by a defendant may be forfeited as part of a criminal sentence. *See United States v. Nava,* 404 F.3d 1119, 1124 (9th Cir. 2005) ("Because . . . 21 U.S.C. § 853[ ] acts *in personam,* it permits the forfeiture of the defendant's interests only, not the property of innocent parties."); *United States v. Gilbert*, 244 F.3d 888, 919 (11th Cir. 2001) ("Because it seeks to penalize the defendant for his illegal activities, *in personam* forfeiture reaches only that property, or portion thereof, owned by the defendant . . . . Stated another way, the property itself is not forfeited; rather, the defendant's *interest* in the property is forfeited.") (citations omitted).

Section 853 requires that a defendant forfeit property that is used to commit a crime or is derived from the proceeds of illegal activity. 21 U.S.C. § 853(a). However, the forfeiture laws recognize that the government may be unable to forfeit direct proceeds or property used to commit unlawful acts when,

> as a result of any act or omission of the defendant [the property]
> (A) cannot be located upon the exercise of due diligence; (B) has
> been transferred or sold to, or deposited with, a third party; (C) has
> been placed beyond the jurisdiction of the court; (D) has been
> substantially diminished in value; or (E) has been commingled
> with other property which cannot be divided without difficulty.

21 U.S.C. § 853(p)(1). Under these circumstances, the government may seek to forfeit what is referred to in the statute as "substitute property," meaning "any other property of the defendant, up to the value of" the property that is directly forfeitable. 21 U.S.C. § 853(p)(2).

Here, because of a pending bankruptcy, the government is unable to obtain the property that was directly involved in John's criminal activity. *See* Preliminary Order of Forfeiture,

3

Docket Entry 147.[3]  The court has therefore ordered forfeiture of any right, title or interest John

has in the Franklin Lakes property and the Safeguard Shares as substitute assets pursuant to 21

U.S.C. § 853(p)(2).  *Id.* ¶ 2(a) and (b).

## II.  Ancillary Claims

A third party who claims an interest in property subject to a preliminary order of

forfeiture may seek to avoid forfeiture by filing a petition claiming an interest in the property

superior to that of the defendant.  Such a petition is addressed in an ancillary proceeding that is

civil in nature and governed by the Federal Rules of Civil Procedure.  *See* Fed. R. Crim. P.

32.2(c).  If there is a hearing, "the petitioner and the Government may present evidence and

witnesses in support of their positions, and the court must consider the relevant portions of the

record from the related criminal case."  *United States v. Nektalov*, 440 F. Supp. 2d 287, 295

(S.D.N.Y. 2006) (*citing* 21 U.S.C. § 853(n)(5)); *see also Pacheco v. Serendensky*, 393 F.3d 348,

351 (2d Cir. 2004).

Whether a petitioner has an interest in the property the government seeks to forfeit is

determined pursuant to the law of the state where the property is located.  *See, e.g.*, *Nektalov*, 440

F. Supp. 2d at 295 (citing additional cases); *United States v. Alcaraz-Garcia*, 79 F.3d 769, 774

(9th Cir. 1996).  Whether the petitioner's interest is sufficient to defeat forfeiture, however, is a

question of federal law.  "If a court determines the claimant has an interest in the property under

the law of the jurisdiction that created the property right, then at the ancillary hearing, it must

---

[3]The government has also stated that it does not seek forfeiture of the house as a directly
forfeitable asset because the Civil Asset Forfeiture Reform Act, Pub. L. No. 106-185, 21, 114
Stat. 225, which authorizes the forfeiture of securities fraud proceeds, did not become effective
until August 23, 2000, after the crimes charged in the indictment were committed.  Gov't Memo.
8/26/05, at 14 n.4, Docket Entry 100.

next look to federal law, *i.e.*, to 21 U.S.C. § 853(n)(6), to determine if the claimant will prevail in the ancillary proceeding." *United States v. Timley*, 507 F.3d 1125, 1130 (8th Cir. 2007). *See also Nektalov*, 440 F. Supp. 2d at 295; *Nava*, 404 F.3d at 1127 ("We have held that '[s]tate law determines whether Claimants have a property interest, but federal law determines whether or not that interest can be forfeited.'") (*quoting United States v. Hooper*, 229 F.3d 818, 820 (9ᵗʰ Cir. 2000)); *United States v. Lester*, 85 F.3d 1409, 1412 (9th Cir. 1996) ("Once the ownership interests are defined under state law, . . . the federal forfeiture statutes determine whether those property interests must be forfeited to the Government.").

To prevail in an ancillary proceeding, a petitioner must prove, by a preponderance of the evidence, that

> (A) the petitioner has a legal right, title, or interest in the property, . . . [that] was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or
>
> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section . . . .

21 U.S.C. § 853(n)(6)(A), (B). *See also Pacheco*, 393 F.3d at 351; *Nektalov*, 440 F. Supp. 2d at 295. If the court determines that the petitioner falls within either of these two categories, the court must amend the preliminary forfeiture order in accordance with its findings. 21 U.S.C. § 853(n)(6). The Order of Forfeiture, as amended based on the disposition of all petitions, then awards the Government "clear title" to any property that remains subject to the order. 21 U.S.C. § 853(n)(7).

**DISCUSSION**

Regina moves for summary judgment pursuant to Section 853(n)(6)(A), arguing that the undisputed evidence demonstrates that her legal right, title, and interest in the Franklin Lakes property and Safeguard Shares was superior to John's at the time of the criminal activity for which John was convicted. The government also moves for summary judgment, claiming that it is entitled to all of the Safeguard Shares and a portion of the Franklin Lakes property. Acknowledging that the Franklin Lakes property is now owned by an LLC, the government also argues that it is entitled to forfeiture of John's interest in the LLC, although it concedes that there are material questions of fact concerning whether and, if so, to what extent, John has acquired a forfeitable interest in the LLC.

*I. Safeguard Shares*

Regina argues that she has a superior interest in the Safeguard Shares because the shares are in her name and were a gift from her husband. Pet.'s Mem., 11/20/07, at 23. Although it is undisputed that Regina holds legal title to the shares, Pl.'s Response to Pet.'s Statement Pursuant to Local Rule 56.1, Response to Fact No. 4, "legal title does not end our inquiry." *Nava*, 404 F.3d at 1129. The claimant's ownership interest must be examined to determine whether it constitutes only "bare legal title," such as that of a "straw" or "nominal" owner, or an actual ownership interest that is valid under the law. *Id.* The government contends that Regina holds only "bare legal title" because the shares were compensation for work performed by John and their issuance in Regina's name was a fraudulent transfer. Gov't Mem., 11/20/07, at 21-22.

As noted above, the extent of Regina's interest in the shares, and the validity of that interest, is determined by state law. Because there is no dispute that the shares are in Regina's

name, the relevant inquiry is whether, under the applicable state law, the issuance of the shares to Regina was fraudulent.

A preliminary question arises regarding which state's law to apply to resolve the government's fraudulent conveyance argument. Safeguard Security Holdings, Inc. is a Nevada corporation, *see* http://www.secinfo.com/dUS3z.v15.b.htm, while the "creditor," the United States, is in New York. It is unclear from the parties' submissions where John performed the work for which he received the shares, although it seems likely, given that he lived there, that he did the work in New Jersey.

A federal court considering a question of state law resolves conflict of law issues by applying the choice-of-law rules of the forum state. *See Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 425 (S.D.N.Y. 2006) (*citing N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43 (2d Cir. 1999)). In applying New York's choice-of-law rules, "'[t]he first step . . . is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'" *Id.* at 426 (*quoting In the Matter of Allstate Ins. Co.*, 81 N.Y.2d 219, 597 N.Y.S.2d 904 (1993)).

New York has adopted the Uniform Fraudulent Conveyance Act, whereas both Nevada and New Jersey have adopted the Uniform Fraudulent Transfer Act. *See, e.g.*, N.Y. Debt. & Cred. Law §§ 270-281; Nev. Rev. Stat. §§ 112.140-112.250; N.J. Stat. Ann. §§ 25:2-20- 25:2-34. The two acts are substantially similar, and whatever differences exist are not relevant here. *Compare* N.Y. Debt. & Cred. Law §§ 270, 276, *with* Nev. Rev. Stat. §§ 112.150, 112.180, *and* N.J. Stat. Ann. §§ 25:2-21, 25:2-25. Therefore, no conflict arises. In any event, the conflict analysis would result in the application of New York law. *See, e.g.*, *Drenis*, 452 F. Supp. 2d at 427 (noting that New York applies an "interest analysis," and that, "when the law is one which

regulates conduct, such as fraudulent conveyance statutes," courts generally apply the law of the jurisdiction where the injury occurred, which is generally where the plaintiff is located).

Under New York law, a conveyance is fraudulent if it is made "with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors." N.Y. Debt. & Cred. Law § 276.[4] To prevail on a fraudulent conveyance claim, a plaintiff creditor must prove, "by clear and convincing evidence: 1) a conveyance; 2) made with actual intent to defraud." *Cadle Co. v. Newhouse*, 2002 WL 1888716, at *6 (S.D.N.Y. Aug. 16, 2002), *aff'd*, 74 Fed. Appx. 152 (2d Cir. 2003) (*citing United States v. Carlin*, 948 F. Supp. 271, 277 (S.D.N.Y. 1996)). "Because of the inherent difficulties in proving fraudulent intent, however, such intent may be inferred from the existence of certain 'badges of fraud.'" *Id.* at *5. "The 'badges of fraud' include: (i) a close relationship between the parties to the transaction; (ii) a questionable transfer not in the ordinary course of business; (iii) inadequacy of consideration; (iv) the transferor's knowledge of the creditor's claim and his inability to pay it; and (v) retention of control of the property by the transferor after the conveyance." *RTC Mortg. Trust 1995-S/N1 v. Sopher*, 171 F. Supp. 2d 192, 201 (S.D.N.Y. 2001).

The circumstances leading to the issuance of the Safeguard Shares to Regina are undisputed and demonstrate John's intent to defraud the United States and shield his assets from forfeiture. The shares were issued as payment for consulting services rendered by John to IQue Intellectual Property, Inc., which was later renamed Safeguard. Plaintiff's Statement Pursuant to

---

[4] Both New Jersey and Nevada law similarly provide, in identical language, that a transfer "is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." Nev. Rev. Stat. § 112.180; N.J. Stat. Ann. § 25:2-25.

Local Rule 56.1, ¶¶ 24-27 (each admitted); Gov't Mem., 1/8/08, at 21 & n.19; Affidavit of Robert A. Forrester, ("Forrester Aff.") ¶ 3, Docket Entry 229. The shares were issued as compensation for John's consulting work, yet were issued not to John but to Regina. Forrester Aff. ¶ 3. John had originally requested that the shares be issued in the name of Sterling Group Bancorp, one of John's companies, but he apparently later changed his mind and requested that the shares be issued in Regina's name. Plaintiff's Statement Pursuant to Local Rule 56.1, ¶ 27. Regina did not pay for the shares, and the sole basis of her claim of ownership is that John gave them to her in 2004 or 2005. *Id.* ¶¶ 24-25.

The timing of the issuance of the shares to Regina further supports an inference of fraudulent intent. As noted above, the parties agree that the Safeguard Shares were issued to Regina in 2004 or 2005. While the precise date on which Regina acquired the shares is not certain, it is clear that the shares were issued to Regina after John was indicted in April 2004, because correspondence with IQue's stock transfer agent regarding the issuance of the shares continued through at least December 2004. Forrester Aff. ¶ 3 and attached document dated December 1, 2004. Although there was no order of forfeiture pending at the time John caused the shares to be issued to Regina, John of course knew after the April 2004 indictment was returned that he had been charged with financial crimes, including money laundering and securities fraud. John – an attorney who practiced securities law, *see* Pre-Sentence Investigation Report ¶ 11 – undoubtedly realized as well that these crimes caused losses that, if proven, would likely lead to an order of restitution, or forfeiture, or both. *See, e.g.*, 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii) (requiring that an order of restitution be included as a component of any sentence imposed on a defendant convicted of an offense against property committed by fraud); 18 U.S.C.

§ 982(a)(1) (requiring an order of forfeiture when a defendant is convicted of money laundering).

Moreover, John was the subject of a pending bankruptcy proceeding at the time the shares were

issued, and he thus undoubtedly knew he would be unable to pay any restitution or forfeiture

ordered by the court in the event of his conviction.  *See* Preliminary Order of Forfeiture at 1

(noting that the defendant had a bankruptcy proceeding pending in the District of New Jersey),

Decl. of Assistant U.S. Attorney Kathleen Nandan dated Nov. 20, 2007 ("Nandan Decl."), Ex. 15

(docket sheet from John's bankruptcy proceeding, indicating that John filed a voluntary petition

on November 8, 2002, and that the petition remained pending until early 2007).  Thus, the

"badges of fraud" enumerated in *RTC Mortgage* are present here: John and Regina had a close

relationship; compensation for services rendered by John was paid directly to Regina, which is an

unusual transaction; Regina paid nothing for the shares; and John knew at the time the shares

were issued that he faced substantial financial liabilities he would be unable to satisfy as a result

of the charges in the April 2004 indictment and his pending bankruptcy.

Although the Safeguard Shares were issued to Regina before any order of forfeiture was

entered, this fact does not defeat the government's fraudulent conveyance claim.  New York law

does not require a party challenging a conveyance as fraudulent to first obtain a judgment; rather,

the term "creditor" is broadly defined in Section 270 of New York Debtor and Creditor Law as "a

person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute,

fixed or contingent."  Moreover, Section 276 permits fraudulent conveyance claims by "present

or future creditors," and as a result, courts have held that, "where the intent to defraud was actual

and affirmative, 'the exact status of the plaintiff, at the time of the acts complained of . . .  is

immaterial.'"  *In re Kovler*, 253 B.R. 592, 596 (Bkrtcy. S.D.N.Y. 2000) (quoting New York State

case law).  Thus, because John had already been indicted by the time the Safeguard shares were issued, the government was at that time already a creditor.

Finally, Regina has failed to present any evidence rebutting the strong circumstantial evidence of John's fraudulent intent.  For example, Regina has not submitted any testimony from John, by way of affidavit or deposition, providing a legitimate, non-fraudulent reason for arranging to have the Safeguard Shares reflecting his compensation issued to Regina.  *See* Docket Entry 263, at 11-14.

The remedy for a fraudulent conveyance is to set the conveyance aside or enter any other order required by the circumstances of the case.  *See* N.Y. Debt. & Cred. Law § 279; *Fed. Deposit Ins. Corp. v. Porco*, 75 N.Y.2d 840, 842, 552 N.E.2d 158 (1990) (holding that "a creditor's remedy for the transfer of its debtor's assets, [even] where undertaken prior to a judgment on the debt, is still to obtain a nullification of the conveyance").  Here, the issuance of the shares to Regina for work John performed was essentially a transfer from John to Regina.  If that transfer is set aside, title to the shares would be held by John, and thus the shares would be subject to forfeiture as a substitute asset.  For all of these reasons, I conclude that Regina is unable to demonstrate a legal right, title or interest in the shares that is superior to John's, and I respectfully recommend that, with respect to the Safeguard Shares, the government's motion for summary judgment be granted and Regina's cross-motion be denied.

## II.  *Franklin Lakes Property*

Regina has also asserted a superior interest in the Franklin Lakes property.  It is undisputed that Regina first obtained title to the Franklin Lakes property in 1988.  Plaintiff's Statement Pursuant to Local Rule 56.1, ¶ 5.  Although the supporting evidence is less clear, the

government assumes for purposes of the pending motions that Regina's assets funded the purchase of the house, and that the house was acquired in her name legitimately and without regard to John's criminal record. Gov't Mem., 11/20/07, at 6. On July 3, 1995, Regina transferred title to John for a period of two weeks so that John could use the property as collateral for a loan; after the two weeks passed, John transferred the property back to Regina. Plaintiff's Statement Pursuant to Local Rule 56.1, ¶¶ 6-8. On September 7, 1999, Regina transferred the Franklin Lakes property to R.H. Surgent, LLC, a Nevada limited liability corporation that was created on or about August 16, 1999. Plaintiff's Statement Pursuant to Local Rule 56.1, ¶¶ 9, 11. The property, which is now in foreclosure, is still held by the LLC, and the LLC, like Regina, opposes its forfeiture.

Although John does not hold legal title to the property, the government nevertheless asserts that at least some portion of it is subject to forfeiture. The government's position rests on two arguments. First, the government argues that, although under state law Regina held legal title to the property when it was transferred to the LLC, a spouse – like John – who provides funds to maintain a home develops an equitable legal interest in it subject to forfeiture under federal common law. Second, the government contends that Regina's interest in the house was diminished by the extent to which it was maintained or improved with the proceeds of John's crimes. *See* Oral Arg. Tr., July 15, 2008, at 27-32; Gov't Mem., 1/8/08, at 6-8.

### A. John's Contribution of Funds While the Property Was Held in Regina's Name

As noted above, the government's claim to the Franklin Lakes property rests on the use of John's funds, including proceeds of his crimes, to maintain and renovate the property. Gov't Mem., 11/20/07, at 18-21. The government concedes that John did not hold legal title to the

12

property at any point in time relevant to forfeiture. Moreover, under New Jersey law, John did not acquire a legal interest in the property simply by being married to Regina. Gov't Mem., 1/8/08, at 5-6. Thus, to prevail on its forfeiture claim, the government must establish that John somehow acquired an equitable interest in the Franklin Lakes property.[5]

New Jersey law provides that a spouse's right to an equitable distribution of marital property vests only upon the entry of a judgment of divorce, *Carr v. Carr*, 120 N.J. 339, 342 (1990). Moreover, under New Jersey law, a husband does not acquire a legal interest in a home titled to his wife even if he is the source of the funds used to acquire it. *See Shayegan v. Baldwin*, 9 N.J. Tax 452, 456 (1987) (pointing out that "when a husband purchases property in the name of his wife a gift is presumed"); 6 N.J. Prac., Wills & Administration § 544 n.1 (Rev. 3d ed. 2008) (noting that "it is still the law of New Jersey that a presumption of gift arises from husband-to-wife transfers," although the use of a wife's funds to purchase property that is put in the husband's name creates a resulting trust in favor of the wife, "despite changing social attitudes promoting equality between the sexes").

New Jersey does recognize that a party may acquire an equitable interest in property. Under New Jersey law, "[i]t is well settled that a resulting trust will be declared in favor of the one paying the purchase price of property transferred to another unless it is shown that the payor manifested an intention that no resulting trust should arise." *Shayegan*, 9 N.J. Tax at 455. However, "[t]he rule raises only a rebuttable presumption . . . designed to provide guidance to the court in determining true intent." *Id.* As noted above, when a husband provides funds for real

---

[5]The Second Circuit has held that a constructive trust may constitute "legal right, title, or interest" for purposes of forfeiture. *United States v. Schwimmer*, 968 F.2d 1570, 1582 (2d Cir. 1992). *See also Nava*, 404 F.3d at 1130-31.

property titled to his wife, New Jersey law presumes a gift was intended. *Id.* at 456. *See also Strong v. Strong*, 40 A.2d 548 (N.J. E. & A. 1945). Thus, New Jersey law presumes that John intended to make a gift to Regina of any funds he may have provided to maintain or renovate the property, and he accordingly did not thereby acquire an equitable interest in the home.

Similarly, there is no basis upon which to impose a constructive trust on John's behalf. In New Jersey, a constructive trust may be imposed if a person holding title has "an equitable duty to convey it to another on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property." *Hill v. Warner, Berman & Spitz, P.A.*, 197 N.J. Super. 152, 168, 484 A.2d 344, 352 (N. J. Sup. Ct. App. Div. 1984); *see also Del. Truck Sales, Inc. v. Wilson*, 131 N.J. 20, 45, 618 A.2d 303 (1993) (citing additional precedents, including one stating that, "[w]hen property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee"); *In re Howard's Appliance Corp.*, 874 F.2d 88, 94 (2d Cir. 1989) (analyzing New Jersey law). A constructive trust may be imposed upon a finding that "there was some wrongful act, usually, though not limited to, fraud, mistake, undue influence, or breach of a confidential relationship, which has resulted in a transfer of property." *D'Ippolito v. Castoro*, 51 N.J. 584, 588, 242 A.2d 617, 619 (1968). Even if the acquisition is not wrongful, a constructive trust arises "where the retention of the property would result in the unjust enrichment of the person retaining it." *Id. See also Carr v. Carr*, 120 N.J. 336, 351-54, 576 A.2d 872, 880-81 (1990) (imposing a constructive trust on marital property in favor of a surviving spouse whose husband died in the midst of divorce proceedings, thereby leaving the court otherwise unable to afford the wife equitable distribution of the marital property

14

under the state's divorce laws). If, however, the transfer of the property was a gift without reservation, and beneficial title is passed, the donee may not subsequently regain an interest in the property. *See Hill*, 197 N.J. Super. at 168.

There is no evidence here that Regina engaged in any wrongful act to persuade John to provide funds for the maintenance or renovation of the property. Nor is there any evidence that John intended the financial assistance he provided to be anything other than a gift to Regina, or that he demanded anything in exchange. Accordingly, there is no basis upon which to impose a constructive trust on John's behalf. *See Hill*, 197 N.J. Super. at 167-68 (noting that there was no evidence that the donee imposed a reservation on the transfer or that he intended the beneficiaries to take anything less than full title to the property at issue).

For all these reasons, it is clear that, as a matter of New Jersey law, John had no legal or equitable interest in the Franklin Lakes property at the time Regina transferred it to the LLC. I next consider the government's argument that John nevertheless acquired a forfeitable interest in the property under federal common law.

## B. Federal Common Law

The government contends that, although John may not have acquired a forfeitable interest in the property under New Jersey law, the court should look to federal common law to determine the relative interests held by John and Regina in the Franklin Lakes property. However, as discussed above, whether a party has an interest in property the government seeks to forfeit is determined pursuant to the law of the state where the property is located. *See, e.g.*, *United States v. Lee*, 232 F.3d 556, 560 (7th Cir. 2000) (looking to state law to determine whether a

defendant's interest in a marital residence was a property interest subject to forfeiture); *Nektalov*, 440 F. Supp. 2d at 295 (citing additional cases); *Alcaraz-Garcia*, 79 F.3d at 774.

In support of its argument that the court should consider federal common law, the government relies on the statement in *United States v. Timley* that,

> if a court determines the claimant has an interest in the property under the law of the jurisdiction that created the property right, then at the ancillary hearing, it must next look to federal law, *i.e.*, to 21 U.S.C. § 853(n)(6), to determine if the claimant will prevail in the ancillary proceeding.

507 F.3d at 1130. However, the government's reliance on *Timley* as support for the proposition that federal law determines whether a party holds more than "bare legal title" is misplaced. Indeed, in a section of the *Timley* decision immediately preceding the portion quoted above, the court reasoned as follows:

> If. . . the property right arises under state law, a federal court will first look to state law to see what interest the claimant has in the property. If the claimant has no interest under state law, the inquiry ends.

*Id.* Although the court in *Timley* was analyzing a claimant's interest, the same reasoning applies to determining whether a defendant holds a forfeitable property interest. Here, as discussed above, John did not acquire any interest in the Franklin Lakes property under state law by virtue of his contributions to its maintenance while it was held in Regina's name.[6] The question of whether any principal of federal common law applies to the forfeiture therefore does not arise.

In *Nava*, 404 F.3d 1119, the court rejected the contention, similar to the government's argument here, that state law determines the "legal title," but federal common law applies to determine whether this title was merely "bare legal title" and therefore not an obstacle to

---

[6]I consider below whether John acquired an interest in the property while it was held by the LLC.

forfeiture. In *Nava*, defendant Victor was convicted for his role in a drug distribution conspiracy. *Id.* at 1126. The jury found that three properties had either been used to facilitate the drug crimes or were acquired with drug proceeds. *Id.* Victor's daughter, Victoria, held deeds to two of the properties and filed claims with respect to both of them. *Id.* Despite the fact that Victoria held title to both properties, the district court, finding that Victoria lacked the means to maintain the houses, held that Victor was the true owner of both properties and directed that they be forfeited. *Id.* at 1127.

On appeal, the Ninth Circuit rejected the trial court's conclusion that federal common law governs the relative property interests of a defendant and a claimant, emphasizing that

> "devolution of property . . . is an area normally left to the States," the transfer of property being a "part of the residue of sovereignty retained by the states, a residue insured by the Tenth Amendment." There are few things as important to the states as to be able to guarantee the integrity of title to real property.

*Id.* at 1128 (*quoting United States v. Oregon*, 366 U.S. 643, 649, 81 S. Ct. 1278 (1961) and *United States v. Burnison*, 339 U.S. 87, 91-92, 70 S. Ct. 503 (1950)). The court reasoned that, "were we to try to create a federal common law of property ownership in forfeitures, it would risk upsetting settled expectations in property transfer rules in the states." *Id.* at 1128. The court thus concluded that it was not "free to reject 'the role of state law' . . . when, irrespective of whether the state would recognize the title, we think the transaction is a sham." *Id.* at 1128 (internal citations omitted). Finally, the court concluded that "the notion of 'bare legal title' can [not] be separated from the principle of 'legal title' and decided as a matter of federal law," *id*. at 1127, and reversed the trial court's forfeiture order, remanding for further proceedings. *Id.* at 1137. *See also United States v. O'Dell*, 247 F.3d 655, 680 & n.9 (6th Cir. 2001) (distinguishing

a case that applied federal law to determine interests in property, and instead, applying state law, noting that "other courts have consistently applied relevant state law in determining whether a third party has . . . a property interest").

The government's reliance on *United States v. Fleet*, 498 F.3d 1225, 1227 (11th Cir. 2007), *see* Oral Arg. Tr. 28-29, is also unavailing. In *Fleet*, the government sought forfeiture of property owned jointly by a defendant and his wife. The defendant sought to avoid forfeiture by invoking Florida's homestead exemption. *Id.* at 1227. The court in *Fleet* held that, although as a matter of state law Florida's homestead exemption prohibited forfeiture, federal forfeiture law preempted the state's homestead provision. "While state law defines the property interests a defendant has, federal law determines whether those property interests are forfeitable for the commission of a federal crime." *Id.* at 1231.

*Fleet* does not apply to the circumstances presented in this case. The court in *Fleet* did not apply federal law to determine whether the defendant had a property interest; it applied federal law to determine that a state law exempting that property interest from forfeiture could not overcome a federal statute requiring that the interest be forfeited. Here, under New Jersey law, John had no legal or equitable interest in the Franklin Lakes property to forfeit. Moreover, the court in *Fleet* held that federal law preempted state law because it discerned a conflict between the federal forfeiture statute and state law. The only cases finding such a conflict pointed to by the government or uncovered by this court are those, like *Fleet*, involving homestead exemptions. *See also United States v. 817 N.E. 29th Drive, Wilton Manors, Fla.*, 175 F.3d 1304, 1311 n.14 (11th Cir. 1999) (holding that federal forfeiture law preempts the Florida homestead exemption); *United States v. Curtis*, 965 F.2d 610, 616 (8th Cir. 1992) (holding that

federal forfeiture law supersedes the Iowa homestead exemption). There is no analogous conflict here.

Even if I were to apply federal common law, it is far from clear that a different result would ensue. In *Nava,* the court identified two lines of cases in which federal courts looked beyond "bare legal title" and attributed ownership to a party other than the nominal owner. "In the first line of cases the defendant once held the title and then transferred his title to a nominal owner. In the second line of cases, the defendant never held title to the property, but the nominal owner also never exercised dominion and control over the property." *Nava*, 404 F.3d at 1134-35 (citations omitted). Here, neither line of cases applies; Regina did not receive her title to the Franklin Lakes property from John, and she resides on the property and thus exercises dominion and control over it. Accordingly, and for the reasons discussed above, I conclude that John had no forfeitable interest in the Franklin Lakes property at the time it was transferred to the LLC.

### C. Tracing and Relation Back in the Context of Substitute Asset Forfeiture

The government's second argument is based on its contention that $1,431,000.96 of fraud proceeds were used to renovate the property. *See* Affidavit of John S. Ellis ("Ellis Aff."). Although it seeks forfeiture of the Franklin Lakes property as a substitute asset pursuant to 21 U.S.C. § 853(p) and not as property derived from criminal proceeds pursuant to 21 U.S.C. § 853(a)(1) , the government contends that an individual may never acquire title to illegal funds as a matter of federal law. It therefore follows, the government argues, that Regina could not have obtained title to that portion of the house that was improved with tainted funds.

In support of this position, the government relies on the decision in *United States v. Henry*, 1995 WL 478635 (6th Cir. 1995) (unpublished opinion). *See* Oral Arg. Tr. 30-33. In

*Henry*, the defendant was convicted of money laundering related to a Medicare fraud scheme, and the government sought forfeiture of his home. *Henry*, 1995 WL 478635, at *1. The jury found that the home was purchased with criminal proceeds, but also found that it should not be forfeited. *Id.* at *3-4 and n.1. Accordingly, the government thereafter pursued the property as a substitute asset. *Id.* The court found that the wife's interest in the home was insufficient to defeat forfeiture because it was acquired with the proceeds of the husband's crimes; the court stated that the wife "was not a bona fide purchaser" of the property, "but rather holds only bare legal title in the property that the defendant purchased with proceeds of his illegal activity." *Id.* at *2-3. The court therefore affirmed the district court's order forfeiting the home. *Id.* at *4.

*Henry* is an unpublished decision that has never been cited by any court for the points relied upon by the government. Moreover, the analysis in *Henry* seems to conflate the principles applicable to direct forfeiture with those that govern forfeiture of substitute assets. In a direct forfeiture action, the government must trace the proceeds of the charged criminal conduct to the property it seeks to forfeit. Forfeiture of a substitute asset, however, requires a different showing: that the defendant is the owner of the property. *See* 21 U.S.C. § 853(p)(2) (providing for forfeiture of "other property *of the defendant*") (emphasis added). Although a substitute asset need not be pure from taint, any connection the asset bears to criminal activity is irrelevant to its forfeitability. *See, e.g.*, *United States v. Jennings*, 2007 WL 1834651, at *2 (N.D.N.Y. June 25, 2007) ("By their very nature, substitute assets are not connected to the original crime."). The *Henry* court's mixing of the rationales underlying direct and substitute asset forfeiture is apparent in the following passage from the decision:

> The essence of Jo-Ann Henry's argument [in opposition to
> forfeiture] is that the relation-back doctrine should not be
> applicable in the forfeiture of a substitute asset.  We need not reach
> this precise question at this time, however, because the substitute
> asset at issue in this case – the 101 Ewing Court residence – was
> purchased with funds illegally obtained by the defendant.  The
> Ewing Court property is therefore directly traceable to defendant
> Tom Henry's illegal actions.  We can be assured of the property's
> traceability by the jury's special verdict finding that the Ewing
> Court property was obtained with illegal funds.

*Id.* at *3.  The court then stated that the home could be forfeited only as a substitute asset because
the jury had found that it was not directly forfeitable.  *Id.* at *4.

The "relation-back" doctrine referred to by the court in *Henry* provides that the
government's interest in property used to commit crimes or  acquired with criminal proceeds
vests at the time the crimes are committed.  21 U.S.C. § 853(c).  In *Henry*, although the court
first concluded that it did not have to consider whether relation-back applies to substitute asset
forfeiture, it nevertheless ordered the forfeiture of the house as a substitute asset because it was
purchased with illegally obtained funds.

In essence, then, and despite the court's assertion that it was not reaching the issue, the
decision to forfeit the house in *Henry* was based upon the relation-back doctrine.  Indeed, the
court stated that, "for the same reason that relation back is applicable to this substitute asset,"
1995 WL 478635 at *3, any property right obtained by the petitioner challenging forfeiture was
defeated by the fact that the funds used to acquire the property were traceable to the illegal
activity.  This fact would be relevant, though, only if the petitioner was unable to acquire title
because the government's right to the property had already vested pursuant to the relation-back
doctrine.

Courts in the Second Circuit, however, have concluded that the relation-back doctrine does not apply to the forfeiture of substitute assets. In *United States v. Kramer*, 2006 WL 3545026 (E.D.N.Y. Dec. 8, 2006), after a thorough analysis of the statutory language and Second Circuit precedent, the court held that

> the relation back provision does not apply to substitute assets. This conclusion is also consistent with common law "taint theory," which only applies the relation back principal to tainted property and not to other assets of the defendant.

*Id.* at *6-8. *See also Jennings*, 2007 WL 1834651, at *3-4; *United States v. Salvagno*, 2006 WL 2546477, at *19 (N.D.N.Y. Aug. 28, 2006). *But see United States v. McHan*, 345 F.3d 262, 271-72 (4th Cir. 2003) (construing Section 853 as permitting application of the relation-back principle to substitute property). Thus, *Henry* offers no support to the government's position in this case.

Finally, the government's reliance on *United States v. Wahlen*, 459 F. Supp. 2d 800 (E.D. Wis. 2006), and *United States v. Totaro*, 345 F.3d 989 (8th Cir 2003), is misplaced. In *Totaro*, the government sought direct forfeiture of a house by tracing the proceeds used to maintain it to criminal activity; a portion of the house was forfeited because the jury found that the property was "acquired or maintained" with criminal proceeds. 345 F.3d at 992. Similarly, in *Wahlen*, the relation-back doctrine was applied only to support forfeiture of marital property acquired with criminal proceeds; after the directly forfeitable portion of the property was identified, the marital interests of the respective spouses in the remaining property were determined, and only the defendant's interest – not his wife's interest – in the untainted property was forfeited as a substitute asset, without regard to the relation back doctrine. 459 F. Supp. 2d at 804, 811, 813-14.

Although the government argues that the applicability of the relation-back doctrine to substitute assets need not be addressed here, the success of its argument depends on the doctrine. The government's contention that Regina could not have acquired an interest in property acquired with illegal funds is plausible only if a superior interest in those funds vested with the government instead. As discussed above, however, courts in this circuit have declined to extend the relation back doctrine to the forfeiture of substitute assets. Accordingly, it is irrelevant that the Franklin Lakes property may have been maintained and renovated with criminal proceeds; even if it was, no interest vested in the government for purposes of substitute asset forfeiture. Simply put, the government's tracing argument is insufficient to defeat Regina's ancillary claim.

### D. Impact of the Transfer of the Franklin Lakes Property to the LLC

As discussed above, Regina held title to the property until September 7, 1999, when she caused it to be transferred to the LLC. Although John may have contributed tainted funds to the maintenance and renovation of the property prior to that date, he did not, for the reasons discussed above, thereby acquire an interest in the property subject to substitute asset forfeiture. I now consider the government's argument that John acquired a forfeitable interest in the property by virtue of his contributions to its maintenance after it was transferred to the LLC.

As a preliminary matter, the government argues that the LLC has failed to file a proper petition challenging forfeiture of the Franklin Lakes property, and that its claim is therefore not properly before the court. However, the original petition filed by Regina explicitly states that she brings the claim "individually and/or as principal of RH Surgent LLC." Petition for Ancillary Proceeding, Docket Entry 164. Thus, it has been clear from the outset of these proceedings that Regina seeks to assert claims to the property on her own behalf as well as on behalf of the LLC.

Moreover, even if Regina's original petition were somehow deficient, that deficiency could be cured by amendment, which is liberally granted pursuant to Federal Rule of Civil Procedure 15.[7] To the extent the government challenges Regina's standing to assert a claim on behalf of the LLC, its argument fails. Corporate entities, of course, may take action only through their agents. *See, e.g., Stop & Shop Cos., Inc. v. Federal Ins. Co.*, 136 F.3d 71, 74 (1st Cir. 1998) (noting that a corporation "can conduct its affairs only through its officers and employees"). As discussed in greater detail below, Regina is identified as the sole manager and organizer of the LLC in the Articles of Organization and subsequently prepared lists of managers and members filed with the Nevada Secretary of State. Thus, Regina is the proper party to act on the LLC's behalf. I therefore reject the government's contention that the LLC has not properly filed a claim in these proceedings.

### 1. Did John Acquire a Forfeitable Interest in the Franklin Lakes Property After It Was Transferred to the LLC?

It is undisputed that the LLC, a Nevada company and a petitioner in this action, currently holds title to the Franklin Lakes property. The Preliminary Order of Forfeiture in this case, Docket Entry 147, calls for forfeiture of John's interest in the Franklin Lakes property, but makes no reference to John's interest in the LLC.[8] The government argues that, by virtue of his participation in the LLC, John has acquired a forfeitable legal interest in the property, Gov't Mem., 1/8/08, at 18. This contention, however, is not supported by Nevada law.

[7]Regina has submitted a proposed amended petition explicitly identifying the LLC as a claimant in the caption. *See* Pet. Mem., 1/8/08, at 12 & Ex. A.

[8]As discussed in greater detail below, the government now seeks to amend the Preliminary Order of Forfeiture to include any interest John has in the LLC as a substitute asset. Docket Entry 261.

Nevada law provides that an LLC "is an entity distinct from its managers and members." Nev. Rev. Stat. § 86.201(3). *See also Montgomery v. eTreppid Techs., LLC*, 548 F. Supp. 2d 1175, 1180 (D. Nev. 2008) ("An LLC has an existence separate from its members and managers."). Moreover, under Nevada law, a company's real and personal property "must be held and owned . . . in the name of the company." Nev. Rev. Stat. § 86.311. Thus, the assets of a corporation are not the property of its shareholders or members. *See Page v. Walser*, 213 P. 107, 112, 46 Nev. 390 (1923) ("It is the general rule that real or personal property . . . conveyed to or acquired by a corporation, are in law the property of the corporation as a distinct legal entity, and not in any sense the property of its members or stockholders."); *see also In re Copper Canyon Mining Co.*, 156 F. Supp. 535, 537 (D.C. Del. 1957) ("It is well established generally that a stockholder of a corporation is not the owner of the corporation's property . . . and that until legally dissolved, a corporation is the absolute owner of all of its property. . . . Nevada, the situs of the real estate in question, recognizes the same principle.") (internal citations omitted). This view is held by many other jurisdictions.[9] For these reasons, I conclude that the LLC holds its

---

[9] *See, e.g.*, *In re Schwab*, 378 B.R. 854, 856 (Bkrtcy. D. Minn. 2007) (*citing In re Albright*, 291 B.R. 538 (Bankr. D. Colo. 2003) and noting that "shareholders in limited liability companies hold membership interests in the LLCs, but do not have ownership interests in property of the LLCs"); *In re Real Mktg. Serv., LLC*, 309 B.R. 783, 788 (S.D. Cal. 2004) ("With regard to limited liability corporations ('LLC's'), members of an LLC hold no direct ownership interest in the company's assets . . . ."); *Capital Parks, Inc. v. Southeastern Advertising & Sales System*, Inc., 864 F. Supp. 14, 16 (W.D. Tex. 1993) ("As the shareholders have no liability, they also have no ownership interest in the corporate assets; those are the sole property of the corporation."); *Pacific Lumber Co. v. Superior Court*, 226 Cal. App.3d 371, 378, 276 Cal. Rptr. 425 (1990) ("[T]he shareholders of a corporation have no ownership right to the real property of the corporation but only a right to ownership of the shares."); *Meitner v. State Real Estate Comm'n*, 1 Pa. Cmwlth. 426, 430, 275 A.2d 417 (1971) ("The courts of this Commonwealth have long held that officers of corporations are not deemed to be the owners of corporate property even to the extent that they are shareholders of the corporation."); *Susskind v. 1136 Tenants Corp.*, 43 Misc.2d 588, 251 N.Y.S.2d 321 (N.Y. City Civ. Ct. 1964) (noting that "a

own, independent legal title to the Franklin Lakes property, and no forfeitable interest in the property itself is currently held by either John or Regina.

*2. Did the Transfer of the Franklin Lakes Property to the LLC Defraud the United States?*

As a separate basis for forfeiture despite the transfer of the property to the LLC, the government asserts that "the LLC is simply a shell, a nominee created to disguise [John] Surgent's ownership interest in the Franklin Lakes property." Gov't Letter, dated 8/11/08. In support of this argument, the government emphasizes that, at his trial, one of John's former employees testified that Surgent "wanted to put his personal assets, his home into an LLC or under his wife's name, Regina Surgent[,] in case anything happened, [so that] his assets would be protected." Nandan Decl. Ex. 13, at 649-50. The employee further testified that, "[s]hould the government ever charge [Surgent] with anything, should anyone ever want to put a lien on his property, he needed to take his properties out of his name for those purposes, to protect the properties." *Id.* Simply put, then, the government asks the court to find that the transfer of the property to the LLC was a fraudulent conveyance, and therefore to ignore the independent status of the LLC and find that John is the real owner of at least a portion of the Franklin Lakes property.

Generally, "the doctrine of alter ego, or 'piercing the corporate veil' involves holding the individual liable for debts and obligations of the corporation." *Mallard Auto. Group, Ltd. v. LeClair Mgmt. Corp.*, 153 F. Supp. 2d 1211, 1213 (D. Nev. 2001). Here, the government seeks

corporation is an entity distinct and separate from its shareholders, no one of whom has a right to receive legal title to any specific property of the corporation" and that, in a cooperative, "the shares of the corporation . . . are sold, and, despite a vernacular use to the contrary, the apartment is not sold but leased under a so-called proprietary lease").

to hold the LLC responsible for the debts and obligations of the individual, John. This is referred to as "reverse piercing," and it is recognized under Nevada law. In *LFC Mktg. Group. Inc., v. Loomis*, 116 Nev. 896, 903-04 (2000), for example, the court noted that "the alter ego doctrine is an exception to the general rule recognizing corporate independence" and that "reverse piercing is appropriate in those limited instances where the particular facts and equities show the existence of an alter ego relationship and require that the corporate fiction be ignored so that justice may be promoted." Moreover, under Nevada law, the same common law standards that govern alter ego liability of corporate shareholders apply to members of limited liability companies. *In re Giampietro*, 317 B.R. 841, 847-48 (Bkrtcy. D. Nev. 2004).

> Under Nevada law, the following requirements must be met to pierce the corporate veil: (1) the corporation is influenced and governed by the stockholder asserted to be its alter ego; (2) there must be such unity of interest and ownership that [the] corporation and the stockholder are inseparable from each other, and (3) adherence to the corporate fiction of a separate entity would sanction fraud or promote a manifest injustice.

*Basic Mgmt. Inc. v. United States*, 569 F.Supp.2d 1106, 1117 (D. Nev. 2008) (citing additional case law). The requirements identified by the court in *Basic Management* apply to reverse piercing as well. *See LFC*, 116 Nev. at 904.

With respect to the third factor, the party seeking to pierce the veil need not prove actual fraud, but it must demonstrate that adherence to the corporate form would promote an injustice. *See In re Nat'l Audit Def. Network*, 367 B.R. 207, 229 (Bkrtcy. D. Nev. 2007) . When considering whether to pierce, courts in Nevada, "'do justice' while ensuring that 'the corporate cloak is not lightly thrown aside." *Giampietro*, 317 B.R. at 856 (internal citations omitted).

I do not consider whether the first two *Basic Management* requirements are met in this case because the government is unable to show that the transfer of the Franklin Lakes property to

the LLC was fraudulent or that recognition of the LLC's separate existence would promote a manifest injustice. The required showing is one of fraud or injustice that in some way injured or defrauded the party seeking to pierce the corporate veil. *LFC Marketing Group,* 8 P.3d at 847 (piercing the corporate veil because "the carefully designed business arrangements" between the corporate entities and the individual running the corporation "contributed to the [creditors'] inability to collect their judgment"); *Polaris Indus. Corp. v. Kaplan*, 103 Nev. 598, 747 P.2d 884 (1987) (noting that disregard of the corporate form is insufficient by itself to warrant piercing; "these actions must also be the cause of [the debtor's] injury").

The government has failed to demonstrate that John and Regina used the LLC to defeat forfeiture or defraud the United States. To the contrary, and as discussed in detail above, the Franklin Lakes property was owned entirely by Regina before it was transferred to the LLC, and John held no forfeitable interest in the property at that time. Accordingly, the transfer of the property to the LLC had no effect on John's creditors, and certainly did not insulate an asset that was previously subject to forfeiture or available to satisfy John's obligations. Indeed, to the extent the government's argument is essentially that the transfer of the Franklin Lakes property to the LLC was a fraudulent conveyance, the remedy would most likely be to set the conveyance aside. *See* N.Y. Debt. & Cred. Law § 279; Nev. Rev. Stat. § 112.210; N.J. Stat. Ann. § 25:2-29. In this case, setting aside the conveyance to the LLC would return the property to Regina as the sole owner. Accordingly, I reject the government's contention that the transfer of the property to the LLC was fraudulent and should be set aside.

*3. Did John Acquire a Forfeitable Interest in the LLC and, if so, in What Amount?*

By Order dated August 6, 2008, Docket Entry 260, I raised a series of questions arising from the fact that the LLC, rather than John or Regina, holds title to the Franklin Lakes property. I held a telephone conference on August 12, 2008 to discuss those questions, and scheduled the submission of supplemental briefs to address them. *See* Minute Entry for conference held on August 12, 2008 and letter briefs submitted as docket entries 263, 264 and 265.

On August 11, 2008, the government filed a letter motion seeking entry of an amended Preliminary Order of Forfeiture that would add John's interest in the LLC as a substitute asset. Docket Entry 261. *See* Fed. R. Crim. P. 32.2(e)(1)(B) (providing for amendment of an existing order of forfeiture on the government's motion to include substitute property). Although the parties indicated during the telephone conference on August 12 that they expected to be able to reach agreement on the government's application to amend Preliminary Order of Forfeiture and resolve it by stipulation, they have not done so. Accordingly, while Regina has indicated that she does not in concept oppose amending the Preliminary Order of Forfeiture to include John's interest in the LLC as a substitute asset, the motion remains pending.

I assume for purposes of this Report and Recommendation that the Preliminary Order of Forfeiture will be amended to add whatever interest John holds in the LLC, if any. However, as acknowledged by counsel during the August 12 telephone conference, and as further reflected in the parties' supplemental letter briefs, whether John has an interest in the LLC and, if so, the extent of that interest, may not be resolved by summary judgement. To the contrary, disputes of material fact abound.

To determine whether John holds an ownership interest in the LLC, I look to Nevada corporate law and the corporate structure of the LLC. Under Nevada law, an LLC must file articles of organization with the Secretary of State. Nev. Rev. Stat. § 86.151(1). The articles of organization should state whether the company will be controlled by managers or members and identify the individuals who will be its managers or members. Nev. Rev. Stat. § 86.161(1)(d).[10] Moreover, an LLC is required by Nevada statute to maintain a list of the names of each of its members and managers. Nev. Rev. Stat. § 86.241(1)(a). Ordinarily, an LLC describes how it will operate and conduct business in articles of incorporation or an operating agreement, and its operating agreement may set forth the manner in which an LLC records the ownership interests of its members. *See, e.g.*, Nev. Rev. Stat. § 86.286(3).

The documentary evidence concerning ownership and control of the LLC is inconsistent. On the one hand, the Articles of Organization for R. H. Surgent LLC, filed with the Nevada Secretary of State on August 16, 1999, state that the LLC is to be run by its managers, and lists Regina as its sole manager as well as the "organizer" executing the Articles of Organization. Nandan Decl., Ex. 11 at NEV 4-5. These Articles do not contain a list of members or any information about the requirements for attaining membership status. Subsequently filed Annual Lists of Managers or Members also indicate that Regina is the sole manager of the LLC, and do not identify any LLC members. *Id.* at NEV 7-10, 14-15, 18.

_____

[10]A manager is "a person, or one of several persons, designated in or selected pursuant to the articles of organization or operating agreement of a limited-liability company to manage the company." Nev. Rev. Stat. § 86.071. A member is similar to a shareholder, and may either own a share of a limited-liability company or function as a noneconomic member. Nev. Rev. Stat. §§ 86.081, 86.091. In Nevada, an LLC may be run by a single member. Nev. Rev. Stat § 86.151 ("At all times after commencement of business by the company, the company must have one or more members.").

On the other hand, however, several documents submitted by the government support the inference that John and Regina intended that John would be a member of the LLC. Regina and John have together signed at least two documents indicating that both are members of the LLC: first, a preprinted form titled "Consent of Members" submitted in support of a mortgage application, signed by both Regina and John together as "all of the members of" the LLC, Nandan Decl., Ex. 20, PHH 429, and second, minutes of a special meeting of the LLC appointing John as managing officer, signed by both John and Regina as "all of the partners." Nandan Decl., Ex. 20, PHH 430. Additionally, John has represented the LLC in several financial transactions. For example, John identified himself as the manager on a mortgage that the LLC took out in January 2000. Nandan Decl., Ex. 7 at 13. In addition, Regina testified that John was the one who decided to mortgage the property, and that she did not participate in the decision. *Id.*, Ex. 6 at 74-77. In October 2000, John signed an amendment to the mortgage on behalf of the LLC as its manager. *Id.*, Ex. 7 at 20. In November 2000, the LLC entered into a Note Modification Agreement, and John signed the document on behalf of the LLC. *Id.,* Ex. 7 at 16. John also signed a home equity line of credit on behalf of the LLC as its manager. *Id.* at 21. Furthermore, John has submitted a certification in a New Jersey foreclosure action identifying himself as "Managing Member" of the LLC. *Id.*, Ex. 14.

In addition to the inferences of ownership and control suggested by these documents, the government argues that John acquired an ownership interest in the LLC by virtue of his financial contributions to the maintenance of its sole asset, the Franklin Lakes property. The government points in this regard to a spreadsheet prepared by Steven Gannuscio, John's accountant, and offered in evidence during John's criminal trial. Nandan Decl. Ex. 13 at 761-64. Gannuscio's

31

spreadsheet indicates that John expended substantial funds on renovations to the Franklin Lakes property even after it was transferred to the LLC. Gov't Mem. of Law at 8; Nandan Decl. Ex. 8. The government has also submitted an affidavit of John S. Ellis, a fraud investigator. Docket Entry 228. In his affidavit, Ellis concludes that substantial funds were withdrawn from John's bank accounts after the transfer of the property to the LLC and during the time John was committing the crimes for which he was prosecuted in this case. Ellis Aff. ¶¶ 2-3 and Ex. JE-1.

Under Nevada law, it seems that contributions of capital, including cash, or services rendered, may give rise to membership status, at least where the individual making the contributions shares in the economic interests of the LLC. *See* Nev. Rev. Stat. §§ 86.081, 86.091, 86.321, 86.341. Thus, although as discussed above any funds John provided to maintain the home prior to its transfer to the LLC are considered a gift under New Jersey law, any funds John provided to maintain the property after its transfer could be either a capital contribution or a loan to the LLC. "Whether 'advances to a corporation are contributions to capital or loans' is a question of fact that should take into account all the circumstances of a particular case." *Gasser v. Infanti Int'l*, 2008 WL 2876531, at *8 (E.D.N.Y. July 23, 2008) (*citing Gilbert v. Comm'r of I.R.S.*, 262 F.2d 512, 513 (2d Cir. 1959)). "To determine whether an advance is a capital contribution or a bone fide loan, courts look at various criteria that fall into three general categories: '(1) the form of the instruments; (2) the intent of the parties[;] and (3) the objective economic reality as it relates to the risks taken by investors.'" *Id.* (*citing Fuscaldo v. United States*, 2001 WL 1519684, at *5 (E.D. Pa. Oct. 30, 2001)). *See also Comm'r v. Fink*, 483 U.S. 89, 97, 107 S. Ct. 2729 (1987) (noting that capital contributors must intend "to protect or increase the value of their investment in the corporation"); *In the Matter of Larson*, 862 F.2d

112, 117 (7th Cir. 1988) ("The distinction between a capital investor and a creditor is not that the latter expects repayment while the former does not. It is that the creditor expects repayment regardless of the debtor corporation's success or failure, while the investor expects to make a profit (hoping for a larger profit than the creditor will make in interest) if, as he no doubt devoutly wishes, the company is successful.").

Here, perhaps not surprisingly, the parties have not presented any documents reflecting the terms on which John provided funds to the LLC or any testimony from John or Regina about their understanding about whether John would receive an ownership interest in the LLC in return for his financial contributions. Moreover, as indicated in the parties' supplemental letter briefs, docket entries 263, 264 and 265, they dispute how the contributions to the LLC made by Regina and John should be valued, and what percentage of ownership, if any, each has acquired. For example, while Regina calculates the value of her contribution to the LLC to be approximately $3.2 million, Docket Entry 263 at 6, the government calculates an amount of less than one million dollars, Docket Entry 265 at 2. Among the reasons for the differences in the parties' calculations is that the government contends that the value of Regina's contribution – the property before renovations funded by John – must be reduced by an outstanding mortgage and line of credit, Docket Entry 264 at 4, while Regina contends that there is no reliable evidence that the mortgage or line of credit were ever taken out or, if so, whether one or both had been paid off in whole or in part at the time the property was transferred to the LLC, Docket Entry 263 at 6-7. Similar disputes surround the valuation of John's contributions. For example, while the government contends that the available evidence supports the inference that John made large payments on behalf of the LLC to service its outstanding mortgage debt, Docket Entry 264 at 8-

11, Regina asserts that the government's inability to present more specific documentation of those payments constitutes a failure to meet its burden of proof. In short, there are genuine disputes of material fact that will likely require additional evidence, including perhaps expert testimony, to resolve.

For all these reasons, and assuming the Preliminary Order of Forfeiture is amended to include any interest John may have in the LLC as a substitute asset, summary judgment with respect to that interest should be denied.

## CONCLUSION

For all the reasons stated above, I respectfully recommend that:

1) With respect to the forfeiture of the Safeguard Shares, the government's motion for summary judgment should be granted and Regina's cross-motion should be denied;

2) With respect to the forfeiture of any interest John holds in the Franklin Lakes property itself, Regina's motion for summary judgment should be granted and the government's cross-motion should be denied; and

3) With respect to the forfeiture of any interest John holds in the LLC, the Preliminary Order of Forfeiture should be amended to include that interest as a substitute asset, the parties' cross-motions for summary judgment should be denied, and further proceedings should be scheduled.

Any objections to this Report and Recommendation must be filed within ten days of this Report and in any event no later than November 18, 2008. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); FED. R. CV. P. 6(a), 6(e), 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

_____/s/_____

STEVEN M. GOLD
United States Magistrate Judge

Brooklyn, New York
October 31, 2008

U:\ASB 2007-2008\United States v Surgent\Surgent 103008.wpd